**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4539**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JOSEPH JAMES CAIN BENSON, a/k/a Black, a/k/a Boston,

Defendant – Appellant.

**No. 18-4540**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

BRYAN LAMAR BROWN, a/k/a Breezy,

Defendant – Appellant.

**No. 18-4577**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MARK XAVIER WALLACE, a/k/a M-EZ, a/k/a Mark Xavier Grinage, II, a/k/a Mark Grinage, a/k/a Mark Xavier Lagrand, a/k/a Mark Xavier Wallace, II, a/k/a Louis Xavier Joseph, a/k/a Mark Wallace, a/k/a Mark Greenwhich,

Defendant - Appellant.

———————————

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News. Raymond A. Jackson, District Judge. (4:17-cr-00045-RAJ-RJK-1; 4:17-cr-00045-RAJ-RJK-3; 4:17-cr-00045-RAJ-RJK-2)

———————————

Argued: January 28, 2020                    Decided: April 24, 2020

———————————

Before NIEMEYER, AGEE, and RICHARDSON, Circuit Judges.

———————————

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Niemeyer joined. Judge Richardson wrote a concurring opinion.

———————————

**ARGUED:** Jeffrey Michael Brandt, ROBINSON & BRANDT, PSC, Covington, Kentucky; Trey R. Kelleter, KELLETERLAW PC, Norfolk, Virginia; Andrew Michael Sacks, SACKS & SACKS, Norfolk, Virginia, for Appellants. Aidan Taft Grano, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Dana R. Cormier, DANA R. CORMIER, PLC, Staunton, Virginia, for Appellant Mark Wallace. G. Zachary Terwilliger, United States Attorney, Howard J. Zlotnick, Assistant United States Attorney, Lisa R. McKeel, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

———————————

AGEE, Circuit Judge:

A federal jury convicted Joseph Benson, Bryan Brown, and Mark Wallace (the "Defendants") of aiding and abetting the use of a firearm in a crime of violence resulting in murder, in violation of 18 U.S.C. §§ 924(c)(1) and (j) and 2. The Defendants appeal, contending that the district court erred in failing to exclude testimony concerning certain codefendant statements. Benson also argues that the court improperly permitted the Government to make prejudicial remarks during its closing argument, and incorrectly instructed the jury to ignore dismissed state charges. And Wallace contests the sufficiency of the Government's evidence, as well as the constitutionality of his conviction.

As an initial matter, we conclude the district court did not err in permitting the challenged testimony under either Federal Rule of Evidence 801(d)(2)(A) or 804(b)(3), and that even if the court erred, it was ultimately harmless. Next, we reject Benson's challenges because the Government's closing argument did not prejudice his substantial rights, and the jury instruction accurately reflected the law. Finally, we affirm Wallace's conviction because the Government presented sufficient evidence that he had advance knowledge that a codefendant would carry a gun, and the predicate offense of Hobbs Act robbery constituted a valid crime of violence for the purposes of a § 924(c)(1) conviction. We therefore affirm all three convictions.

I.

A.

3

On the morning of March 13, 2009, Louis Joseph, Jr. was at home in Newport News, Virginia, babysitting his girlfriend's five-year-old son, J.W, when two men entered through the front door, pushed Joseph to the ground, and instructed J.W. to go to the bedroom. While there, J.W. heard two gunshots. After J.W. emerged to check on Joseph, he misunderstood Joseph's direction to seek help and instead returned to the bedroom. When his mother returned home from work around 4:00 p.m., she found Joseph lying on the back patio. Shortly after she called emergency services, first responders arrived and pronounced Joseph dead. He had been shot five or six times, with lethal wounds in his stomach, lungs, ribs, and his thigh's femoral vein.

### B.

In October 2017, a federal grand jury returned a superseding indictment naming Benson, Brown, Wallace, and a fourth codefendant, Rosuan Kindell, in connection with Joseph's death. Each was charged with aiding and abetting the use of a firearm in relation to a crime of violence[1] resulting in murder, in violation of 18 U.S.C §§ 924(c)(1) and (j) and 2. The four had only been connected loosely prior to Joseph's death: Wallace and Brown were both from the Hampton Roads area of Virginia and knew one another, while Benson and Kindell were both from Boston, Massachusetts and also knew each other. In turn, Wallace's cousin had introduced him to Kindell. Brown had no prior connection with Kindell or Benson.

---

[1] Here, the underlying crime of violence was Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a).

Following a joint trial, a jury acquitted Kindell, but convicted Benson, Brown, and Wallace. Those three Defendants now appeal the district court's decision to permit cooperating witnesses to testify as to their codefendants' out-of-court statements. In addition, Benson asserts error in the Government's closing arguments and jury instructions issued in relation to certain state charges. Wallace challenges the sufficiency of the Government's evidence with respect to, and the constitutionality of, his conviction.

At the outset, we review the Government's trial evidence, which can be grouped into four sets: (1) the crime scene investigation; (2) cell phone records, including call records and cell-site location information ("CSLI"); (3) a New York gun trafficking investigation; and (4) statements made by the Defendants to cooperating witnesses.

1.

As an initial matter, the crime scene investigation revealed that Joseph's front door had been forced open. In turn, investigators recovered 0.40 caliber cartridge cases and a copper-jacketed bullet, while the autopsy revealed additional copper-jacketed bullets.

Investigators also found blood on a chair in the residence. Based on a DNA profile developed from the blood sample, the forensics lab made a potential match with Benson. As a result, the Newport News Police Department ("NNPD") arrested Benson at his Boston residence in January 2010, after which he was held on state charges at Newport News City Jail.[2] And after receiving a DNA sample from Benson following his arrest, a technician concluded that the blood taken from the chair matched Benson's DNA profile.

---

[2] The state charges were dismissed in December 2010.

2.

Phone records and CSLI—which were assessed by the Government's forensics experts—revealed the nature of the Defendants' communications and tended to show that Wallace was responsible for communicating amongst the Defendants. Specifically, Benson's and Kindell's phones were repeatedly in touch with Wallace's, as was Brown's. However, Brown's phone did not reflect any communication with Benson or Kindell.

Further, these records and CSLI reflected the Defendants' locations prior to Joseph's death. On March 11, 2009, two days before Joseph's death, Wallace and Kindell exchanged multiple calls. CSLI also revealed that Kindell and Benson traveled from Boston to Williamsburg over the course of that day. And on the morning of March 13— shortly before Joseph's death—Wallace called Brown three times between 9:41 and 9:56 a.m. After that, Wallace's phone moved from Williamsburg to Newport News and stopped movement around 10:15 a.m. at Joseph's home tower.[3] It remained there until around 10:35 a.m., when it moved into the Hampton Roads area.

Throughout that afternoon following Joseph's death, Wallace repeatedly communicated with the other Defendants. Further, Wallace's afternoon travel included the area of the Greyhound bus station. During this same time period, Kindell repeatedly called Greyhound's toll-free number (in addition to calls to Benson and Wallace). And although Greyhound records showed that Kindell and Benson were originally scheduled to depart

---

[3] An assessment of Joseph's cell phone showed his "home tower"—that is, the one most associated with his phone—was a specific one in Newport News. It also showed that his phone stopped making outgoing transmissions around 10:12 a.m. on March 13.

on March 14 and 20, respectively, CSLI and Greyhound tickets showed the two men accelerated their departure and left for Boston at 10:20 p.m. on the evening of March 13.

### 3.

In the meantime, as part of a separate New York gun trafficking investigation, a New York City police detective listened to a wiretapped phone call around 6:15 p.m. on March 13, the day of Joseph's death. On the call, Brown offered to sell his New York contact two firearms: a "Smith" that was his and a "Ruger." J.A. 372. The next month, the detective observed an undercover gun buy in which one of the gun traffickers sold an undercover officer two 0.40 caliber, semi-automatic pistols—a Ruger P94 and a black CZ. That black CZ pistol bore a stamp ("40 S&W") indicating that the pistol fired 0.40 caliber Smith & Weston ammunition—that is, it was a "Smith." J.A. 389. In turn, microscopic analysis confirmed that the cartridge cases and bullets recovered from the scene of Joseph's death were fired from those two guns.

### 4.

As noted previously, a number of witnesses testified about out-of-court statements that the Defendants made to them regarding Joseph's death.

#### a.

About a week after Joseph's death, Brown spoke with his friend, Brandon Douglas, who became a cooperating witness. According to Douglas, Brown asked him for a ride. When Douglas asked about the whereabouts of Brown's truck, Brown responded that "it was hot, meaning that the police was looking for it," further explaining that his truck had been involved in a "robbery" that "didn't go as planned, that it went wrong." J.A. 669–70.

7

Although, Brown told Douglas, the incident had originally been planned as "[j]ust a breaking and entering" by Brown and two others—who "had been doing homework" on Joseph—Wallace "took it over" because "he could execute it better" and brought in two men from Boston. J.A. 671–73. The Defendants then took Brown's truck to Joseph's residence, where the "two Boston dudes" approached the front door with Brown behind them. J.A. 674. According to Douglas, Brown stated that these men then broke down the door and went inside "[g]ung ho," after which Brown heard gunfire and ran back to the truck. J.A. 675.

b.

In turn, Wallace spoke with two law enforcement officers over the course of a 2012 investigation into Joseph's death. NNPD Detective Erik Kempf testified at trial that on three occasions between March and April 2012, Wallace called him to discuss his participation in the offense. On March 20, Wallace stated that he "was just a thief and that this particular incident was supposed to be a burglary." J.A. 621. On April 11, Wallace told Detective Kempf that "he and others . . . took Bryan Brown's truck" to Joseph's house. J.A. 622.

Similarly, FBI Agent Jean Andersen testified that on April 5, Wallace told her that he "wanted to talk about the murder because it was the right thing to do." J.A. 810. Wallace then told her that "he did not go into the house where the murder occurred but he was there out front in a car" and that "he was shot at by the people who committed the murder and that the bullet hit the metal part of the seat belt and it bounced off." J.A. 810.

c.

8

Finally, Benson also made statements to three cooperating witnesses. First, Wayne Turner shared a cell with Benson in the Newport News City Jail. According to Turner, Benson asked if Turner knew Wallace and Brown, stating that "they did the joint he was locked up for." J.A. 753. He also said he didn't like "messing around with drugs, because people tell on you," and that "he'd rather do robberies." J.A. 754. Benson also noted that Wallace had "brought him and his man down [from Boston] to do some licks"—that is, "[a] robbery." J.A. 754.

Second, Brenda Rivera, Benson's family friend, visited him in May 2010 while he was in the Jail. During her visit, Benson told her that he was in Newport News "last year for two days . . . just two days only" "[w]ith a dude from up my way" who "knew some dudes down here." Ex. 114A. He stated that he was "doing something [he] wasn't supposed to do," Ex. 114A, but further clarified that he "didn't do nothing." J.A. 765.

Third, Willie Berry testified that he knew both Kindell and Benson in Boston. A few weeks before the March 13 incident, Benson asked Berry for a gun. And while Berry, Benson, and Kindell were together in Boston, Kindell asked Berry to ride to Virginia with them to conduct a robbery; Berry declined. After their return to Boston, Benson told Berry that during the robbery, he "went inside and things got ugly and the person got shot." J.A. 785. He also observed that there had been a child in the house.[4]

C.

---

[4] Berry also testified that Kindell recounted that he and Benson had gone "inside the house," that "they got into a tussle," and that "after the tussle things got ugly and somebody got shot." J.A. 783–84. Kindell also stated to Berry that Benson's blood was in the house.

The Defendants generally challenged this witness testimony under the Confrontation Clause insofar as the out-of-court statements made by each Defendant named and thereby implicated other Defendants. *See Bruton v. United States*, 391 U.S. 123 (1968) (holding that the admission of a non-testifying codefendant's out-of-court statement inculpating a defendant by name violated a defendant's right to confront witnesses against him or her). Further, according to the Defendants, the statements were not admissible under any hearsay exception.

In response, the Government argued the statements were nontestimonial and thus did not implicate the Confrontation Clause. In support, it advanced two bases for admissibility: as (1) opposing party statements pursuant to Federal Rule of Evidence 801(d)(2)(A) and (2) statements against interest pursuant to Rule 804(b)(3). The Government acknowledged that if admitted as opposing party statements, the testimony would require limiting instructions confining the consideration of such statements solely against the declarant. And if admitted as statements against interest, they would require corroborating circumstances indicating their trustworthiness.

The district court generally agreed that there was no Confrontation Clause issue for any of the witness statements. It also addressed admissibility under Rule 801 or 804—including the necessity of limiting instructions—on a case-by-case basis as to each witness. Further, as part of the final charge, the court also gave three general jury instructions. First, the court charged the jury "to give separate and personal consideration to the case of each individual defendant," "leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants." J.A. 977–78. Second, it charged that "[e]ach

10

defendant is entitled to have his case determined from evidence as to his own acts, statements, and conduct and other evidence in the case which may be applicable to him." J.A. 978. Third, the court repeated limiting instructions about codefendant statements.[5]

Now, in addition to contesting such testimony, the Defendants appeal other asserted errors related to the Government's closing arguments; jury instructions; and the sufficiency of the evidence.[6] This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II. Admission of Codefendant Statements

We begin with the Defendants' challenges to the district court's admission of their codefendants' out-of-court statements. Specifically, the Defendants challenge statements made to five witnesses: Douglas, Detective Kempf, Turner, Berry, and Rivera.

This Court reviews evidentiary decisions for an abuse of discretion but legal conclusions concerning the Federal Rules of Evidence or Constitution de novo. *United States v. Landersman*, 886 F.3d 393, 413 (4th Cir. 2018). Even if an evidentiary error implicates a defendant's constitutional rights, the Court reviews "that error for harmlessness." *United States v. Poole*, 640 F.3d 114, 118 (4th Cir. 2011); *see also United States v. Clarke*, 2 F.3d 81, 85 (4th Cir. 1993) (noting that the Court need not resolve an alleged *Bruton* violation when the alleged error is harmless).

---

[5] In addition, following Benson's closing argument, Brown's counsel moved for a mistrial, arguing that the Government had used evidence outside the limiting instructions. The court denied the motion, noting it had given a cautionary instruction to the jury to disregard any potentially misstated evidence.

[6] Wallace requested dismissal of the indictment or a new trial. Benson and Brown requested vacatur of their convictions and a new trial.

As noted, the Defendants challenge these codefendant statements on the basis that that the statements (1) violated the Confrontation Clause and/or (2) were generally inadmissible under the Federal Rules of Evidence. The first type of challenge is governed by *Bruton*, which held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating testimonial statement[7] of a non-testifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant. 391 U.S. at 126; *see id.* at 135–37 ("[W]here the powerfully incriminating extrajudicial statements of a codefendant . . . are deliberately spread before the jury in a joint trial . . . we cannot accept limiting instructions as an adequate substitute for [the defendant's] constitutional right of cross-examination.").

*Richardson v. Marsh* made clear that *Bruton*'s rule was a narrow one. 481 U.S. 200 (1987). If the statement of a non-testifying codefendant incriminates another only by virtue of linkage to other evidence at trial—that is, if it incriminates "inferential[ly]" rather than "facially"—then it does not implicate *Bruton*. *Id.* at 208–09. Nonetheless, a confession may still be facially incriminatory—and thus inadmissible even with a limiting instruction— where the inferences required to link the statement to the defendant are of the type "that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Gray v. Maryland,* 523 U.S. 185, 196 (1998). Ultimately, when *Bruton*

---

[7] "The primary determinant of a statement's testimonial quality is whether a reasonable person in the declarant's position would have expected his statements to be used at trial—that is, whether the declarant would have expected or intended to bear witness against another in a later proceeding." *United States v. Dargan,* 738 F.3d 643, 650 (4th Cir. 2013) (internal quotation marks omitted).

is not implicated, the assumption is that jurors follow any limiting instructions, including considering an opposing party statement strictly against the party who made it. *Richardson*, 481 U.S. at 208–09.

In turn, as noted above, the district court concluded the challenged testimony (1) did not implicate *Bruton* and (2) was admissible either as an opposing party statement under Rule 801(d)(2)(A) or a statement against interest under Rule 804(b)(3). Rule 801(d)(2)(A) provides that a statement is not hearsay if "the statement is offered against an opposing party" and "was made by [that] party in an individual or representative capacity." Thus, a defendant's own statements constitute "admissions by a party-opponent and [are] admissible pursuant to" this Rule. *United States v. Wills*, 346 F.3d 476, 489 (4th Cir. 2003); *see also United States v. Jones*, No. 19-4090, 2019 WL 6724464, at *3 (4th Cir. Dec. 11, 2019) (unpublished) (concluding defendant's "out-of-court statement that he was involved in [the victim's] murder" constituted a "statement made by a party and offered against that party"). Meanwhile, Rule 804(b)(3) provides for an exception to the hearsay rule for statements that (1) a "reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability" and (2) "is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."

In sum, we conclude that none of the admitted statements presented a *Bruton* issue, and that they were all properly admitted under either Rule 801(d)(2)(A) or 804(b)(3). To

13

the extent such admission did constitute error, however, we conclude that any error was harmless given the scope of the properly admissible evidence against each Defendant.[8]

### A. Benson and Wallace's Challenge to Douglas's Testimony

At trial, Douglas—Brown's friend who had given him a ride a week after Joseph's death—testified that Brown had complained to him that Wallace had taken over the robbery and brought in two "Boston dudes," further describing how he had accompanied them to Joseph's front door. J.A. 670. Following Douglas's testimony, the court concluded that Brown's statement was nontestimonial and therefore did not implicate *Bruton*. Further, the court instructed the jury that the testimony could only be considered against Brown as an opposing party statement under Rule 801(d)(2)(A), not against any other codefendant.[9]

On appeal, Benson, one of the Defendants from Boston, argues that the testimony violated *Bruton* because it improperly implicated him. He also argues it constituted inadmissible hearsay. Further, both Benson and Wallace argue that Douglas's testimony was so prejudicial that it violated their rights to a fair trial.

We disagree. As an initial matter, *Bruton* does not apply here because the Confrontation Clause is only implicated in the context of testimonial statements. *Dargan*,

---

[8] *See Thigpen v. Roberts*, 468 U.S. 27, 30 (1984) ("[W]e may affirm on any ground that the law and the record permit and that will not expand the relief granted below."); *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005) ("We are not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record.").

[9] Specifically, the court instructed the jury that "you may only consider [Douglas's] testimony about what Brown said against Brown. You may not consider any testimony he provided about what Brown said other co-defendants did against another co-defendant, only against Brown[.]." J.A. 718.

14

738 F.3d at 651 ("*Bruton* is simply irrelevant in the context of nontestimonial statements."); *see also Ohio v. Clark*, 135 S. Ct. 2173, 2180 (2015). Brown's statements to Douglas were non-testimonial. Douglas was a longtime personal friend of Brown, and their conversation occurred "maybe a week or more" after Joseph's death, in Douglas's car. J.A. 668. And because "testimonial evidence does not include statements made to friends in an informal setting," *United States v. Alvarado*, 816 F.3d 242, 252 (4th Cir. 2016), any *Bruton* challenge presented by Benson is unavailing.

Further, we conclude the testimony was properly admitted as an opposing party statement against Brown alone. And because Douglas's testimony was admitted against only Brown, it was not part of the body of evidence that the jury could consider in assessing the guilt of Benson or Wallace. *Cruz v. New York*, 481 U.S. 186, 190 (1987).[10] Thus, we can only reverse if there is some specific reason to doubt that the jury adhered to the district court's limiting instruction. But we must presume the jury followed the district court's Rule

---

[10] The district court considered admitting Douglas's testimony as a statement against interest under Rule 804(b)(3) "if there [was] sufficient corroborative evidence in the record with respect to what [Brown] says about Wallace." J.A. 262. However, the court never ruled it was admitting the evidence under Rule 804(b)(3).

To the extent Wallace and Benson challenge the admission of Douglas's testimony under Rule 801(d)(2)(A) as insufficient to cure any prejudice against them, we conclude that the district court's admission of Douglas's testimony under Rule 804(b)(3) would have been sufficient to cure any evidentiary error given that, under Rule 804(b)(3), limiting instructions are unnecessary and there was sufficient corroborative evidence in the record regarding Wallace and Benson. *Cf. United States v. Barbee*, 524 F. App'x 15, 18–19 (4th Cir. 2013) (noting the requirements of Rule 804 need not be met where Rule 801 is satisfied). Ultimately, however, we conclude any evidentiary error, regardless of whether it sounds in Rule 801 or 804, was harmless given the extent of the Government's other evidence against Wallace and Benson. *See Thigpen*, 468 U.S. at 30.

801 instruction. *Richardson*, 481 U.S. at 206–08 (observing courts apply an "almost invariable assumption of the law that jurors follow their instructions"). To overcome this presumption, Benson and Wallace would have to demonstrate not only that the jury was unable to follow the court's instructions but also that the evidence was highly prejudicial. *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987). But it is highly unlikely the jury would have been confused because the court offered (1) contemporaneous limiting instructions with respect to Douglas's testimony and (2) three general limiting instructions in the final charge. Benson and Wallace have offered no reason to conclude the jury disregarded them.[11]

Further, even if the admission of Douglas's testimony somehow amounted to error, any abuse of discretion in admitting it was harmless given the abundance of other evidence presented against Benson and Wallace. *See Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (harmless error review requires consideration of "what effect [the asserted constitutional error] had upon the guilty verdict"); *Brown v. United States,* 411 U.S. 223, 231 (1973) (finding *Bruton* error harmless where the erroneously-admitted evidence was "merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury"); *United States v. Basham*, 561 F.3d 302, 327 (4th Cir. 2009) ("Erroneously admitted evidence is harmless if a reviewing court is able to say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." (internal quotation marks omitted)).

---

[11] Kindell's acquittal lends further support to the notion that the jury followed the court's instructions.

Here, the Government's case rested on the Defendants' own admissions, reliably corroborated by other evidence, including forensic evidence in the form of DNA samples and phone and bus records. As to Benson, the jury heard about his statements to Berry before the crime asking for a gun and his statements after the crime discussing the robbery (in which he described a struggle inside Joseph's residence and seeing a child). The jury also heard about his conversation with Rivera, in which he admitted to coming down to Virginia with somebody else from Boston. Further, the Government presented evidence of Benson's DNA inside Joseph's house; CSLI illustrating Benson's travel from Boston to Virginia with Kindell; phone records showing communications with Wallace and Kindell around the time of Joseph's death; and the abrupt change in his return ticket after Joseph's death. And as to Wallace, the Government presented evidence of his cell phone communications with his codefendants, the CSLI showing his location, and his admissions to law enforcement that he was present for the robbery. In sum, we conclude the admission of Douglas's testimony was harmless as to Benson and Wallace.

### B. Brown's Challenge to Detective Kempf's Testimony

We turn next to Detective Kempf's testimony recounting his conversation with Wallace, in which Wallace stated that "he and others . . . took Bryan Brown's truck" to Joseph's home. J.A. 622. Although Brown objected to this statement, the district court concluded it was "non-testimonial" and did not present a *Bruton* issue. J.A. 622. Brown's counsel thereafter requested a limiting instruction, which the court deferred ruling on to "the end of the case if it's necessary." J.A. 624. Over the course of the rest of the trial, the court did not specifically mention Detective Kempf's testimony. However, as noted earlier,

17

it gave a general limiting instruction that the jury consider the statements made by each Defendant as evidence only against that Defendant. Brown now argues that the statement amounted to a *Bruton* violation and an abuse of discretion.

Although it is a close question, we agree that the statement did not present a *Bruton* issue because it was not facially incriminating as to Brown. To implicate *Bruton*, a statement cannot incriminate "inferentially"—that is, "only when linked with evidence introduced later at trial." *Richardson*, 481 U.S. at 208. Although Brown asserts that the statement unambiguously named him as a participant in the crime, we agree with the Government that this characterization overstates the testimony. Wallace merely observed that "he and others . . . took Bryan Brown's truck" to Joseph's home. Left unsaid was whether Brown was physically present in the truck or at the house, or that Brown approved or even knew of Wallace's use of his truck.

At most, there was the *possibility* that the jury might infer that because Brown's truck was involved, so was he. But the mere possibility of Brown's involvement does not mean that Wallace's statement was facially incriminating. To have been incriminating in a *Bruton* sense, the statement must have obviously referred to Brown's direct participation in the offense. *Richardson*, 481 U.S. at 208. For example, this Court has concluded that a co-conspirator's post-arrest statement to a special agent—which generally discussed his use of his backyard shed as a contraband storage facility and noted that he had known the defendant, a next-door neighbor, his entire life—was not facially incriminating because it could not "be said to suggest that [the defendant] engaged in any crimes." *United States v. Locklear*, 24 F.3d 641, 645–46 (4th Cir. 1994). Similarly, the Ninth Circuit has concluded

18

that a codefendant's testimony failed to facially incriminate because "when [the codefendant] did insert [the defendant] into his narrative, he never claimed [the defendant] seized, detained, threatened, injured, or demanded ransom for any of the victims," as required for the offense of conspiracy to commit hostage taking. *United States v. Mikhel*, 889 F.3d 1003, 1045 (9th Cir. 2018) And the Fifth Circuit has declined to find a *Bruton* issue even where a non-testifying co-conspirator's statements placed the defendant at the scene of the crime because the statement itself was "utterly silent as to [the defendant's] whereabouts and activities" during the offense and would require several inferential jumps to arrive at the defendant's participation in offense. *United States v. Lage*, 183 F.3d 374, 387 (5th Cir. 1999). Here, even if Wallace's statements tended to corroborate that Brown had, at a minimum, given his truck to the codefendants and, at most, been present at the crime scene, it would not have been sufficient by itself to establish his participation in the offense because it would have required linkage to additional evidence. *See also Mikhel*, 889 F.3d at 1045 (rejecting the argument that codefendant testimony "corroborated the government's evidence against" the defendant because none of the evidence "*on its own*, directly established that" the defendant had engaged in the offense).

But even if we were to assume a *Bruton* error here, it would be harmless. Brown himself admitted to Douglas that he owned the truck used to transport the Defendants to Joseph's house; that he helped to plan the crime; and that he was present when the other participants kicked the front door in (a description corroborated by crime scene investigators). Brown's own statements thus subsumed Wallace's passing reference to his truck by supplying far more incriminating information. And the Government presented

19

additional evidence that Brown armed and transported his codefendants—including his wiretap statement that he owned one of the firearms used to kill Joseph and his sale of the weapon—and his repeated communications with Wallace (the chief organizer) directly before and after the murder.[12]

## C. Brown and Wallace's Challenge to Turner's Testimony

We turn next to the testimony of cooperating witness Turner, who was Benson's cellmate at the Newport News City Jail. According to Turner's trial testimony, Benson told him that he came down from Boston to conduct a robbery, and that Brown and Wallace "did the joint [Benson] was locked up for." J.A. 753. Following Turner's testimony, the court instructed the jury that it could "consider the witness's testimony about what Mr. Benson said about himself" solely against Benson, and could not consider "what he said other co-defendants may or may not have done or said." J.A. 761.

On appeal, Brown and Wallace argue that the admission of Benson's statements violated *Bruton*. We disagree, concluding that statements to a cellmate are plainly non-testimonial and thus do not implicate *Bruton*. *Dargan*, 738 F.3d at 650–51 ("[S]tatements from one prisoner to another are clearly nontestimonial." (internal quotation marks omitted)). In turn, the district court admitted the statements with a Rule 801 limiting instruction. And given that Brown and Wallace have offered no reason to conclude the jury

---

[12] To the extent Brown asserts an evidentiary error, we disagree, concluding Wallace's statement was admissible under Rule 801 on the basis of the district court's general limiting instruction. *Smith*, 395 F.3d at 519 (affirming "on any grounds apparent from the record"). Further, even assuming an evidentiary error, it was harmless.

20

disregarded the instruction, we must assume that the jurors followed it. *Richardson*, 481 U.S. at 206, 211.

Finally, even if the admission of this statement amounted to an evidentiary error, it would be harmless. *Landersman*, 886 F.3d at 413 (noting a non-constitutional evidentiary error is harmless if the "judgment was not substantially swayed by the error"). As discussed at length above, the Government presented substantial evidence of the involvement of both Brown and Wallace in the offense, including their own admissions.

### D. Wallace's Challenge to Berry's Testimony

We next consider the admission of Berry's testimony, which described his conversations with Benson and Kindell before and after their participation in the offense. Following Berry's testimony, the district court stated it was "not issuing a limiting instruction on this witness" because his testimony "would clearly fall under [Rule] 804(b)(3)" and "this record is sufficiently full of independent corroboration." J.A. 800.[13] Wallace challenges the admission of this testimony, claiming it was highly prejudicial.

We reject Wallace's challenge. As an initial matter, we conclude there was no Confrontation Clause issue because the statements to Berry were non-testimonial. *Alvarado*, 816 F.3d at 252 (concluding "testimonial evidence does not include statements made to friends in an informal setting"). Thus, to the extent Wallace can argue error, it can only be an evidentiary one. But we agree with the district court that the statements made

---

[13] Specifically, the court observed "his testimony involved testimony directly about what two co-defendants said, and, to the extent he mentioned another co-defendant here, this record is sufficiently full of independent corroboration." J.A. 800.

21

by Benson and Kindell were statements against interest under Rule 804(b)(3) and were sufficiently corroborated by the record. Further, any evidentiary error would have been harmless because of all of the other evidence, as noted, that was presented against Wallace. We therefore conclude the district court did not err in admitting Berry's testimony.

### E.  Wallace's Challenge to the Tape of Rivera's Visit to the Jail

Finally, we conclude the district court did not err in admitting the tape recording of the conversation between Rivera and Benson, in which Benson admitted to being in Newport News at the time of the murder. During trial, Wallace requested a limiting instruction as to this tape. The district court declined, stating it did not believe a limiting instruction was "necessary in this case." J.A. 767. Although the court did not specify the basis for declining to issue a limiting instruction, we agree that the tape of the conversation between Rivera and Benson constituted a statement against Benson's interest under Rule 804(b)(3), which the court had generally considered earlier. This conversation was further corroborated by the evidence in the record. *United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995) (noting the Court may affirm an evidentiary record on any basis apparent in the record). And, for the reasons discussed previously, any error as to Wallace was harmless.

* * *

In sum, we conclude that the challenged statements were properly admitted under either Rule 801(d)(2)(A) or 804(b)(3). To the extent there was any error, it was harmless.

### III. Benson's Challenge to the Government's Closing Argument

We turn now to Benson's contention that the Government's closing argument constituted prosecutorial misconduct because it invoked Douglas's testimony on three occasions to establish Benson's guilt. In all three instances, the Government reiterated that Douglas's testimony was admissible only against Brown. Nonetheless, according to Benson, the statements all improperly referenced him in violation of his due process right to a fair trial, with the district court compounding the error by failing to declare a mistrial.

We disagree. Although some of the Government's closing came close to improperly arguing Benson's guilt, we conclude the Government did not engage in prosecutorial misconduct. When a defendant alleges prosecutorial misconduct, it must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Caro*, 597 F.3d 608, 624 (4th Cir. 2010). Specifically, "the defendant must show (1) the prosecutor's remarks or conduct were improper and (2) that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." *Id.* (internal quotation marks omitted). Neither requirement is met here.

We first consider whether the remarks were improper. We agree with the Government's view that the first comment was properly directed to arguing Brown's role in the offense supplying firearms. Specifically, the Government argued:

> Brown, also an aider and abettor, he has a role. . . . He arms one of the suspects, at least one of them, beforehand. . . . [H]e is providing transportation, he's providing a gun. . . .
>
> [Y]ou heard Brandon Douglas testify, and this was testimony against Brown, with the Court's limiting instruction, that he was at the scene and he armed at least one of the people. They didn't have guns. We know that when Benson came down here [Brown was at the scene and armed at least one of the people].

23

J.A. 853–54. Read in context, it is apparent that the Government was arguing that the jury was permitted to conclude that Brown had supplied the guns based on: (1) Brown's admission to owning one of the murder weapons and (2) the inference that his codefendants did not have guns before coming to Virginia.[14] *See United States v. Abu Ali*, 528 F.3d 210, 243 (4th Cir. 2008) (noting prosecutor's closing arguments must be "[t]aken in context"). Thus, any reference to Douglas's testimony was properly in the context of arguing Brown's guilt.

With respect to the second comment, the Government stated that Douglas's testimony showed that Brown was with the "Boston Boys" at the robbery, then immediately noted, "We know who the Boston Boys are[.]" J.A. 856. We observe that these two statements, coupled together, could be construed as using Douglas's testimony as further evidence of Benson's guilt. Nonetheless, we conclude they do not warrant reversal. As an initial matter, the reference to the "Boston Boys" occurred while the Government was arguing the circumstantial evidence supporting Brown's guilt, not Benson's. Specifically, the Government's references to the "Boston Boys" corroborated Brown's statements to Douglas with reference to other admissible evidence, including that two men from Boston were present. Further, it is clear, given all the other admissible evidence against him, that this comment did not prejudice Benson. *United States v. Scheetz*,

---

[14] The Government expressly noted this inference to the jury: "[Y]ou heard testimony today from Willie Berry that Benson was asking him for a firearm; therefore, you can infer that he did not have a firearm when he left Boston." J.A. 855.

24

293 F.3d 175, 186 (4th Cir. 2002) ("Most importantly, absent the prosecutor's improper remark, the government's case against [the defendant] was overwhelming.").

The third comment occurred while the Government was arguing that Brown was aware that the crime was an armed robbery as there would be no reason to bring others down from Boston to commit a simple burglary.[15] Specifically, the Government observed how Brown knew details about the planning of the crime: "[A]s we heard again, evidence admissible against Brown, through Douglas, he told him that this was taken over. And again, we know the link between Kindell, Wallace, and we know that . . . Kindell had the link and the contacts with . . . Benson." J.A. 858.[16] Thus, the Government appropriately linked Brown's statements to other admissible evidence—such as the connection between Wallace, Kindell, and Benson, as well as Benson's request for a gun—to argue that Brown knew that the plan called for an armed robbery, not just a burglary. Given this, and that the Government mentioned the appropriate instructions, the comments were not improper.[17]

---

[15] The Government was entitled to argue this inference to fulfill the elements for an aiding and abetting conviction—specifically, as discussed below, that a defendant had to have advance knowledge that a codefendant would be armed.

[16] The Government also submitted: "It was a robbery, ladies and gentlemen, before [Benson and Kindell] left Massachusetts. Otherwise, why is Benson asking Berry for a gun?" J.A. 858.

[17] With respect to the second prong of the prosecutorial misconduct test, the Court considers: (1) the degree to which the remarks had a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced; (4) whether the comments were deliberately placed to divert attention; (5) whether the remarks were invited by improper defense conduct; and (6) whether curative instructions were given. *United States v. Lopez*, 860 F.3d 201, 215 (4th Cir. 2017). As to the first, third, and sixth factors, there was no prejudice, particularly when considered in light of the admissible evidence against Benson (which established the same facts that Benson complains were improperly linked to him in

Finally, this Court has concluded that curative instructions eliminate prejudice from improper closing arguments even when comments are both "misleading and extensive." *United States v. Chong Lam*, 677 F.3d 190, 204 n.13 (4th Cir. 2012). Here, the district court instructed the jury continuously on the evidentiary limitations, both specifically as to Douglas's testimony and generally, and also instructed the jury that "[s]tatements and arguments of counsel are not evidence in the case[.]" J.A. 978. Given that Benson has presented no credible arguments to rebut the presumption that the jury followed these instructions, there is no cognizable error in the Government's closing argument.

## IV. Benson's Challenge to the State Charge Jury Instruction

Next, we consider Benson's argument that the district court improperly charged the jury to ignore the 2010 dismissal of his state charges. During trial, a former detective testified that the state charges brought against Benson in connection with the murder were dismissed. In closing, Benson's counsel argued that the DNA evidence with respect to the blood sample was unreliable and that the cooperating witnesses were not credible. Counsel then suggested that because the state prosecutor had previously considered substantially the same evidence, the prosecutor's dismissal of the charges in state court—and the dearth of new evidence developed since then—demonstrated reasonable doubt. Afterwards, the district court observed that the invocation of the dismissal "[left] an impermissible

the Government's closing). With respect to the second, the challenged comments were isolated, amounting to three allegedly improper statements in arguments directed toward a different defendant. Finally, the fourth and fifth factors appear irrelevant. Thus, Benson's substantial rights were not affected.

26

inference in this case that Mr. Benson shouldn't be here because they dismissed the charges in Newport News." J.A. 891. The court *sua sponte* instructed jurors that "the dismissal of charges in the state court has no role in your decision about what the verdict should be in this case; it's irrelevant in terms of what you have to decide in this case." J.A. 895. Benson now challenges that instruction as depriving him of his constitutional right to a fair trial because it denied him the ability to establish his defense.

Though constitutional claims are generally reviewed de novo, a defendant's argument that "he was not allowed to present a particular defense" is "better framed as an evidentiary" one, subject to an abuse of discretion standard. *United States v. Malloy*, 568 F.3d 166, 177 (4th Cir. 2009). Similarly, this Court reviews "the district court's decision to give or refuse to give a jury instruction for abuse of discretion." *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009). Further, the court's discretion to give such instructions extends throughout the trial, even after closing. *United States v. Muse*, 83 F.3d 672, 676–77 (4th Cir. 1996) (upholding the authority to give an "appropriate corrective instruction" even after closing when counsel argued "an extraneous consideration").

We conclude the instruction did not constitute an abuse of discretion. In reaching this conclusion, we consider whether "the instructions accurately and fairly state the controlling law." *Passaro*, 577 F.3d at 221 (internal quotation marks omitted). And here, we conclude that instruction accurately reflected the law because the state's decision not to prosecute did not make any fact material to the federal aiding and abetting charge more or less probable. *See* Fed. R. Evid. 401 (describing relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence");

27

Fed. R. Evid. 402 (observing "irrelevant evidence is not admissible"). Put another way, a state's decision to drop charges may have nothing at all to do with guilt or innocence, particularly in relation to a federal crime with distinct elements. As other courts have observed, non-prosecution decisions are irrelevant because they often take "into consideration the availability of prosecutorial resources, alternative priorities, the expectation of prosecution by other authorities, or any number of other valid discretionary reasons." *United States v. Bingham*, 653 F.3d 983, 999 (9th Cir. 2011). Other circuits have uniformly upheld the exclusion of evidence of prior charging decisions because it "risks misleading the jury and confusing the issues." *United States v. Reed*, 641 F.3d 992, 993–94 (8th Cir. 2011); *cf. United States v. Halteh*, 224 F. App'x 210, 214 (4th Cir. 2007) (observing "the limited probative value of an acquittal on prior charges relating to the same conduct at issue in a later trial may be substantially outweighed by the danger of unfair prejudice or jury confusion"); *United States v. De La Rosa*, 171 F.3d 215, 220 (5th Cir. 1999) (citing seven circuits who agree "evidence of prior acquittals are generally inadmissible").

Benson also argues the court's curative instruction prejudiced him by excluding the argument *after* his closing. But a curative instruction to ignore an "extraneous consideration" introduced by a defendant's closing argument is well "within this court's discretion." *Muse*, 83 F.3d at 677; *see also United States v. Baptiste*, 596 F.3d 214, 226 (4th Cir. 2010) (observing trial judges have "broad discretion" to control closing arguments). Further, Benson was not prejudiced because the instruction did not prevent him from raising his defenses, which focused on purported evidentiary gaps, the lack of

28

cooperating witnesses' credibility, and the unreliability of the DNA evidence. And because his underlying argument—that the evidence did not overcome reasonable doubt—remained fully viable, the instruction did not violate his constitutional rights.[18]

## V. Wallace's Challenges to His Conviction

### A. Sufficiency of the Government's Evidence as to Wallace's Foreknowledge

Finally, we consider two challenges Wallace mounts as to his conviction. As an initial matter, Wallace argues his conviction must be overturned because the Government presented insufficient evidence of his foreknowledge that a codefendant would be armed. To prove aiding and abetting under § 924(c), the Government must show "that the defendant actively participated in the underlying . . . violent crime with *advance knowledge* that a confederate would use or carry a gun during the crime's commission." *Rosemond v. United States*, 572 U.S. 65, 67 (2014) (emphasis added). *Rosemond* emphasized that the defendant's advance knowledge must come at a point at which "the accomplice can do something with it—most notably, opt to walk away." *Id.* at 78. By "deciding . . . to go ahead with his role in the venture[,] that shows his intent to aid an *armed* offense." *Id.*[19]

___

[18] And although Benson argues that the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense, this right "is not absolute: criminal defendants do not have a right to present evidence that the district court, in its discretion, deems irrelevant or immaterial." *United States v. Prince-Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003). For the reasons discussed, it is evident that the court deemed Benson's defense based on the dismissed charges irrelevant.

[19] The district court also properly offered a *Rosemond* instruction, telling the jury it must find "the defendant must have actively participated in the crime of violence with advance knowledge that another participant would use or carry a firearm during and in relation to, or possess a firearm in furtherance of the crime of violence." J.A. 993.

Wallace's conviction must be upheld if there is substantial evidence to support it. Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (en banc) (internal quotation marks omitted). In evaluating the evidence, this Court must "view the evidence in the light most favorable to the [G]overnment, drawing all reasonable inferences in its favor" and "assum[ing] the jury resolved all contradictions in testimony in favor of the [G]overnment." *Id.* Insufficient evidence may be found "only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).

Here, the evidence of such advance knowledge need not be direct. Other circuits have concluded that where there is evidence that a defendant extensively participated in the planning of a robbery of the type that would generally necessitate the use of firearms, such evidence is sufficient to fulfill this requirement. For example, in *United States v. Akiti*, the Eighth Circuit affirmed the jury's finding that the defendant had advance knowledge that his co-conspirator in the armed robbery of a credit union would carry a gun despite a lack of direct evidence. 701 F.3d 883 (8th Cir. 2012). The government had presented evidence that the defendant "played a major role in planning the robbery"; that he "was very familiar" with the credit union that was robbed; that the plan involved robbery during business hours when multiple employees were present (thereby necessitating a firearm); and that the defendant was with his armed co-conspirator in his own apartment "immediately before the robbery." *Id.* at 887. Based on all of this, the Eighth Circuit agreed that "a reasonable jury could have concluded [the defendant] knew [the co-conspirator]

30

would be armed during the robbery." *Id.*; *see also Rosemond*, 572 U.S. at 77 (citing *Akiti* approvingly).

Similarly, in *United States v. Jordan*, the Fifth Circuit observed that although evidence of aiding and abetting an armed bank robbery was circumstantial, the defendant had been observed "communicating with various co-defendants" on the morning of the robbery; "moving between the robbery vehicles"; was on a conference call with the codefendants before and "throughout the commission of the robbery"; and was arrested in a vehicle following another co-conspirator after the robbery (with multiple weapons recovered from co-conspirators' vehicles). 945 F.3d 245, 259–61 (5th Cir. 2019). Based on this, the Fifth Circuit determined that a reasonable jury "could conclude that [the defendant] was aware that his co-defendants would be carrying weapons in the commission of the robbery[.]" *Id.* at 261; *see also United States v. Henry*, 722 F. App'x 496, 499–500 (6th Cir. 2018) (same); *United States v. Spinney,* 65 F.3d 231, 237 (1st Cir. 1995) (same).

The same analysis applies here. As Wallace correctly observes, there is no direct evidence that he had advance knowledge that a codefendant would carry a gun into the robbery. Nonetheless, in light of this Court's deferential review of the jury's findings, we conclude a rational trier of fact could have concluded that this element of the crime had been proven beyond a reasonable doubt because the Government presented substantial evidence that Wallace organized his codefendants to execute an *armed* robbery. Specifically, Wallace was the only defendant who knew and communicated with all three of the other defendants before and after the murder (and the only link between the victim in Virginia and Benson and Kindell in Boston). Wallace communicated with Kindell

31

immediately before Kindell and Benson travelled from Boston to Williamsburg. On the morning of the murder, Wallace called Brown, who possessed one of the guns used in the murder and owned the truck Wallace admitted "he and others . . . took to . . . [t]he homicide." J.A. 622. Further, according to Wallace's cell phone records and his own admissions, Wallace then went to Joseph's home, where Joseph's car was visibly present, at precisely the time Joseph's phone stopped making outgoing transmissions. Finally, after the murder, Wallace repeatedly called the other Defendants and traveled with Kindell and Benson to the Greyhound bus station for their accelerated departure.

From this evidence of Wallace's relationships and extensive communications with the other codefendants—especially directly before and after the murder—the jury could have reasonably inferred that Wallace was the chief organizer of an armed robbery. As in *Akiti*, the evidence supported a reasonable jury's conclusion that Wallace was intimately involved with planning and executing the robbery, travelled with his armed codefendants to the robbery, and saw a car in Joseph's driveway (leading to the inference that a firearm would be necessary to proceed). *See* 701 F.3d at 887. In turn, that jury could have concluded that Wallace knew his codefendants would be armed. Thus, to the extent the evidence presented conflicting inferences,[20] the jury was entitled to resolve them in favor

---

[20] In arguing there was insufficient evidence of his advance knowledge, Wallace relies on his statements to law enforcement that he stayed in the vehicle and that his codefendants shot at him. However, given the evidence of his continued contact with the other Defendants after the robbery, the jury was entitled to conclude these statements were a false attempt at exculpation.

of the prosecution. *Moye*, 454 F.3d at 394 (observing that "where the evidence supports differing reasonable interpretations, the jury will decide which interpretation to accept").

Finally, as *Rosemond* itself observed, a defendant's continued participation "after a gun was displayed or used by a confederate" permits the jury to "infer from his failure to object or withdraw" that he had the requisite foreknowledge. 572 U.S. at 78 n.9; *see also United States v. Manso-Cepeda*, 810 F.3d 846, 850 (1st Cir. 2016) (observing that the jury could have inferred from the defendant's failure to withdraw after becoming aware of the gun that he had advance knowledge of the gun); *United States v. Newman*, 755 F.3d 543, 546 (7th Cir. 2014) (observing that the defendant's continued cooperation with a co-conspirator after he had learned the co-conspirator was using a shotgun led to the conclusion that the defendant had advance knowledge of firearm possession). Wallace's post-crime communication with and transportation of the other codefendants arguably meets that standard. In sum, we conclude that a reasonable jury could have found sufficient evidence to support Wallace's advance knowledge.

## B. Constitutionality of Wallace's Conviction

Finally, Wallace argues his conviction under 18 U.S.C. § 924(c)(1) and (j) should be reversed and the superseding indictment dismissed in light of *United States v. Davis*, 139 S. Ct. 2319 (2019). There, the Supreme Court held that the residual clause of the definition of "crime of violence" found at § 924(c)(3)(B) is unconstitutionally vague. Wallace submits that because he was convicted under a subsection of § 924(c), he was convicted under a constitutionally infirm statute.

33

Wallace's challenge is without merit. Here, the predicate offense for the § 924(c) "crime of violence" was Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a). In *United States v. Mathis*, this Court concluded that Hobbs Act robbery constitutes a crime of violence under the force clause at § 924(c)(3)(A), *not* the residual clause at § 924(c)(3)(B). 932 F.3d 242, 266 (4th Cir. 2019). Therefore, any determination by *Davis* regarding the residual clause has no bearing on whether Hobbs Act robbery constitutes a valid crime of violence for the purposes of a § 924(c)(1) conviction.

## VI.

For the foregoing reasons, we affirm the Defendants' convictions for aiding and abetting the use of a firearm in a crime of violence resulting in murder, in violation of 18 U.S.C. §§ 924(c)(1) and (j) and 2. The judgment of the district court is

*AFFIRMED*.

RICHARDSON, Circuit Judge, concurring in part and concurring in the judgment:

These convictions should be affirmed, and I readily join Judge Agee's analysis in Sections I, II.D, II.E, III, IV, and V. But I have two modest reservations. First, although I agree "it is a close question," Majority Op. at 18, I believe Detective Kempf's testimony incriminates Brown. And as incriminatory testimony, it creates a *Bruton* issue. Second, I doubt the district court properly applied Rule 801(d)(2)(A) to admit the portion of Douglas's testimony discussing Wallace and to allow Turner's testimony about Brown and Wallace. Despite these misgivings, I agree that any errors were harmless. *See id.* at 19–20 (finding any *Bruton* error harmless); *id.* at 16–17 (determining Douglas's testimony was harmless); *id.* at 21 (considering Turner's testimony harmless). So I join the Majority opinion in part and concur in the judgment.