**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-4094**

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

KENNETH WATKINS,

Defendant.

---

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., District Judge.  (3:20-cr-00385-RJC-DCK-9)

---

Argued:  May 8, 2024                                        Decided:  August 2, 2024

---

Before KING and RICHARDSON, Circuit Judges, and Gina M. GROH, United States District Judge for the Northern District of West Virginia, sitting by designation.

---

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judges King and Groh joined.

---

**ARGUED:**  Paul Stephen Kish, KISH LAW LLC, Atlanta, Georgia, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

RICHARDSON, Circuit Judge:

A federal jury convicted Kenneth Watkins of conspiracy to possess a controlled substance with intent to distribute it. On appeal, Watkins raises several objections to how his case was tried before that jury, as well as how the district court sentenced him following his conviction. Finding no reversible error, we affirm.

## I.    Background

### A.    Facts

Steven "Ziggy" Cloud operated a Charlotte, North Carolina-based record label that produced rap music. Suspecting that Cloud and others involved with his label were dealing drugs, investigators obtained a wiretap for Cloud's cellphone. They eventually determined that Kenneth "KennyMan" Watkins—an Atlanta, Georgia-based rap musician who operated a recording studio called K3Soundz—dealt drugs with Cloud.

Evidence introduced at trial centered around three trips that Cloud directed two couriers to take from Charlotte to Atlanta to obtain pills for him. The first trip, in the summer of 2020, involved Jonquilla Sanders. At Cloud's instruction (but without any money from Cloud), Sanders traveled to Atlanta to "pick up some pills." J.A. 121–22. While there, Sanders received what she estimated to be 10,000 pills[1] from someone she described as a tall, light-skinned black man who drove a red sportscar—a man she later testified was not Watkins. Sanders then drove back to Charlotte and left the pills in Cloud's car.

---

[1] Sanders said they "[l]ooked like X pills," that is, ecstasy or MDMA. J.A. 123.

2

The second trip took place from October 16 to 17, 2020. Cloud told Sanders that it would be "[t]he same thing" as before. Unlike the first trip, however, Cloud handed Sanders a stack of cash, which she never counted. Also unlike the first trip, Sanders did not travel alone; Cloud sent along a man called "Reggie."

During this second trip, investigators intercepted calls among Sanders, Cloud, and Watkins. Those calls linked the three of them and suggested that Sanders was obtaining drugs from Watkins in Atlanta. The calls reflect that Sanders was to meet Watkins at Club Diamonds, where Watkins was performing—although Watkins explained over the phone that he would not "have it in there." J.A. 136, 138; S.A. 7. Cloud also instructed Sanders to give the cash to Watkins and to speak only to him. Sanders duly complied.

The intercepted calls and Sanders's testimony further established that, after Watkins finished performing at Club Diamonds, he and Cloud directed Sanders to drive to K3Soundz. Watkins eventually arrived at the studio and told Sanders that he still did not have "what [she] was coming to get." J.A. 142. So Sanders followed Watkins in her vehicle to a residence located about fifteen minutes away. Watkins entered the house and soon emerged with a box, which he gave to Sanders. Sanders never looked inside the box but assumed it contained pills based upon her past dealings with Cloud and his remark about the "same thing."[2] She returned to Charlotte and delivered the box to Cloud.

The third drug-supply trip to Atlanta occurred later that month. Rather than Sanders, this trip involved another woman, Latisha Anderson. A week before the trip, Anderson

---

[2] Sanders pleaded guilty to conspiring to distribute a controlled substance based upon that single transaction.

3

texted Cloud, asking, "You have pills"?  S.A. 43.  Cloud said yes.  He followed with another text telling Anderson that someone had "let sumone steal my bag wit 4000 in it last nite."  J.A. 201; S.A. 43.  Anderson responded, "Damn omfg," to which Cloud replied, "Yea man shit got me tight."  J.A. 201; S.A. 43.  Two days later, Anderson texted Cloud and told him that she "needed pills but I guess I'll get them tomorrow."  J.A. 199; S.A. 41.  Cloud inquired of Anderson:  "I'm almost ready again u gone take dat trip?"  J.A. 199; S.A. 41.  Anderson asked when, and Cloud stated that he did not know but had about "2000 left."  J.A. 200; S.A. 41–42.

Anderson drove to Atlanta on October 24, 2020.  She arrived at ten o'clock in the morning, around the time the transaction was scheduled to take place.  Frustrated after waiting an hour, Anderson began to return to Charlotte when Cloud finally called her at 11:25 a.m.[3]  Anderson complained that she had been on the road since 6:30 a.m.  Cloud said he would try to call Watkins.  Cloud then managed to connect Watkins to the call and explained that Anderson had been waiting for an hour.  Watkins responded, "I'm fixing to go straight to her right now."  S.A. 11–12.  Cloud gave Anderson the address to K3Soundz, which Anderson said was seventeen minutes away.  Twenty minutes later (11:54 a.m.), Watkins told Cloud to let Anderson know he was on the way and would arrive in ten minutes.  At 12:02 p.m., Cloud relayed the message to Anderson.  At 12:42 p.m., Cloud called Anderson and asked if she was "situated"; Anderson answered, "Yeah."  S.A. 16.

---

[3] At 10:49 a.m., Anderson had texted Cloud, "Bout to leave I will bring ur money when I get back to the city."  J.A. 369; S.A. 44.

Based on their monitoring of Cloud's phone and the similarities with Sanders's earlier trips, investigators believed Watkins had supplied Anderson with drugs. They therefore arranged for a uniformed local police officer to stop Anderson on the interstate highway between Atlanta and Charlotte at around two o'clock in the afternoon. After a drug canine alerted for narcotics, police discovered 8,909 pills inside a Versace box in the car. The pills were divided into eleven plastic bags by color and shape. Eleven of the pills—one from each of the plastic bags—were later tested and found to contain the schedule I controlled substance eutylone. Law enforcement also found $4,638 cash in the car's center console.

## B.    Procedural History

A federal grand jury impaneled in the Western District of North Carolina issued a twenty-three-count superseding indictment that named Watkins as a defendant. The indictment alleged that Watkins conspired with eight others, including Cloud, to possess eutylone with an intent to distribute it. *See* 21 U.S.C. §§ 841(a)(1), 846. Watkins pleaded not guilty and proceeded to a three-day trial.

At trial, Watkins's defense focused on Anderson's version of the events that took place during her October 24 trip to Atlanta. She testified that she "didn't meet *anybody* until 10:30 or 11 o'clock" in the morning but did not meet *Watkins* until between 12:30 and 1:00 p.m.—implying that she met someone else between 10:30 and 11:00 a.m. J.A. 319–20 (emphasis added). And Anderson denied that Watkins gave her drugs when they

5

eventually connected at K3Soundz that afternoon. She claimed instead that Watkins gave her $4,500 cash, which she assumed was a music-related payment.[4]

That left the alleged 10:30–11:00 a.m. meeting that is not reflected in the texts or calls. Anderson testified in vague terms that she received a box "from a gentleman" whose identity she refused to disclose. J.A. 315, 323–24. "[She] rolled the window down and he placed the box in the passenger seat." J.A. 323. While driving back to Charlotte, Anderson opened the box and observed bags filled with pills.

Two defense witnesses purported to corroborate Anderson's receipt of the pills from the unidentified man. Ayesha O'Neill, who was involved with Watkins's music, recalled seeing Anderson receive a large Versace box from a tall, light-skinned black man driving a red sportscar at a gasoline station near K3Soundz at about ten o'clock in the morning. O'Neill admitted that she saw Anderson meet Watkins at K3Soundz but said that was after seeing her with the man at the gas station. Similarly, Kizzy Childs, Watkins's wife, testified that she saw a light-skinned black man driving a red sportscar hand the Versace box to Anderson at a gas station. Childs likewise said that she later saw Anderson at K3Soundz, where she observed Watkins hand Anderson $4,500 cash to deliver to Cloud as payment for a music video.

Despite this testimony, the jury convicted Watkins and the district court sentenced him to a decade in prison, three years of supervised release, and a $100 fine. Watkins timely appealed.

---

[4] Anderson did not explain why, two hours earlier, she texted Cloud that she was leaving and would bring him his money.

6

## II.    Discussion

Watkins raises five arguments on appeal: First, that the district court erroneously denied his motion for a judgment of acquittal. Second, that the court erred in permitting inquiry about lyrics from his music. Third, that the court's rejection of his proposed jury instructions was erroneous. Fourth, that the court erred in calculating the converted drug weight attributable to him. And fifth, that the court erroneously denied his motion for a downward departure. We reject each in turn.

### A.    Denial of Motion for a Judgment of Acquittal

Following the prosecution's case-in-chief, Watkins moved for a judgment of acquittal. *See* Fed. R. Crim. P. 29(a) ("After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."). The district court denied Watkins's motion, and Watkins did not renew it at the close of all the evidence. *See id.* Instead, he waited until two weeks after conviction to renew the motion. *See* Fed. R. Crim. P. 29(c)(1) ("A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."). The district court denied that motion, too.

#### 1.    Standard of Review

In order for us to review *de novo* a defendant's challenge to the sufficiency of the evidence, we must have before us a properly preserved motion for a judgment of acquittal. *See United States v. Fall*, 955 F.3d 363, 374 (4th Cir. 2020); *United States v. Fuertes*, 805 F.3d 485, 497 (4th Cir. 2015). As Rule 29 lays out, a defendant can move for acquittal at

7

three different times.  Rule 29(a) states that the motion can be made either "[a]fter the government closes its evidence or after the close of all the evidence."  Rule 29(c)(1) provides that a defendant can move for acquittal (or renew a prior motion[5]) "within 14 days after a guilty verdict."

Not all of these motions, however, are considered properly preserved for appellate review.  When a defendant moves for a judgment of acquittal after the prosecution rests and then proceeds to present evidence at trial, he must later renew the motion to preserve appellate review.  That is because, "[b]y introducing evidence, the defendant waives his objections to the denial of his motion to acquit." *United States v. Calderon*, 348 U.S. 160, 164 n.1 (1954); *see United States v. Foster*, 783 F.2d 1082, 1084–85 (D.C. Cir. 1986) (en banc) (Scalia, J.).  If so waived, appellate review is foreclosed unless the defendant can show "a manifest miscarriage of justice." *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998); *cf. United States v. Chong Lam*, 677 F.3d 190, 200 & n.10 (4th Cir. 2012).

Thus, a defendant who moved for acquittal at the close of the prosecution's case, was denied, and then introduced his own evidence must move for acquittal again to preserve his challenge to the sufficiency of the evidence.  It is well-established that renewing a motion for a judgment of acquittal after the close of all the evidence, but before the case is submitted to the jury, properly preserves the defendant's appellate challenge. *See, e.g.*, *United States v. Diaz-Diaz*, 433 F.3d 128, 136–37 (1st Cir. 2005).  But Watkins didn't do this.  He waited until after he was convicted to move—pursuant to Rule 29(c)(1)

---

[5] A defendant need not move for acquittal under Rule 29(a) to later move for acquittal pursuant to Rule 29(c)(1).  Fed. R. Crim. P. 29(c)(3).

rather than Rule 29(a)—for acquittal. So we must ask if this later motion has the same preservative effect, despite the defendant's failure to renew the motion at the close of all the evidence.[6]

We conclude that it does. Remember, the reason that we typically don't review motions made and denied after the close of the prosecution's evidence but never renewed is because the defendant is treated as having forfeited a challenge to the denial of his motion by subsequently presenting evidence. But that cannot be said of a Rule 29(a) motion made or renewed after the close of all the evidence, or of a postconviction Rule 29(c) motion, because both motions are made (and then denied) *after* the defendant has submitted evidence. It would be odd to treat the submission of evidence as waiving review of a motion that hasn't even been made. In accordance with this logic, courts consider Rule 29(a) motions made or renewed after the close of all the evidence as properly persevered for appellate review. *See* 2A Charles A. Wright et al., *Federal Practice and Procedure* § 463 (4th ed. 2024); *cf. Calderon*, 348 U.S. at 164 n.1. We see no meaningful reason to treat Rule 29(c) motions any differently. *See* 2A Wright et al., *supra* § 469 ("If a defendant files a motion under Rule 29(c) after the verdict, . . . then that preserves the sufficiency issue for review . . . even if no motion was filed or renewed during trial."). Thus, regardless

---

[6] One could read our precedent to have already determined that it does so. In *United States v. Fall*, Fall "moved for acquittal on Count 6 after the close of the government's case, [but] failed to renew the motion *after trial*." 955 F.3d at 374 (emphasis added). Thus, we held that "Fall failed to properly preserve th[e] issue," and the argument was "waived." *Id.* The negative implication is that "renew[ing] the motion after trial"—*i.e.*, within 14 days of the verdict pursuant to Rule 29(c)(1)—*would* properly preserve a motion made "after the close of the government's case." But this is only an implication, not a holding.

9

of whether the defendant moves for acquittal after the close of all the evidence (under Rule 29(a)), after the jury renders a verdict (under Rule 29(c)(1)), or both, he has not waived the right to challenge the denial of the motion.

Accordingly, we hold that a Rule 29(c)(1) postconviction renewal of a motion for a judgment of acquittal made after the prosecution rests its case-in-chief properly preserves for appellate review the defendant's challenge to the sufficiency of the evidence.[7] Such is the case with respect to Watkins. So we review the district court's denial of Watkin's motion *de novo*. *United States v. Royal*, 731 F.3d 333, 337 (4th Cir. 2013). But, like the district court, we must give deference to the jury's determination: "On an appeal challenging the sufficiency of evidence, we assess the evidence in the light most favorable to the government, and the jury's verdict must stand unless we determine that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*[8]

---

[7] *Accord United States v. Gonzalez*, 528 F.3d 1207, 1211 (9th Cir. 2008); *United States v. Allen*, 127 F.3d 260, 264 (2d Cir. 1997); *United States v. Pless*, 982 F.2d 1118, 1122 (7th Cir. 1992); *United States v. Castro-Lara*, 970 F.2d 976, 980 (1st Cir. 1992); *United States v. Allison*, 616 F.2d 779, 784 (5th Cir. 1980) (per curiam); *Gov't of Virgin Islands v. Carr*, 451 F.2d 652, 654–55 & n.3 (3d Cir. 1971).

[8] The prosecution suggested in its briefing that Watkins filed his postconviction motion for a judgment of acquittal three months late. In that case, the district court would have no power to enter a judgment of acquittal. *Carlisle v. United States*, 517 U.S. 416, 421 (1996). But the prosecution made an understandable error. According to the cover pages of the trial transcripts in the joint appendix submitted to this Court, Watkins's trial occurred from March 6–8, 2022. If this were right, then Watkins's June 23 motion would be well without Rule 29(c)(1)'s time limit. Yet the district court's docket says that Watkins's trial took place from *June* 6–8, 2022. And the evidence suggests that the docket's dates are correct. For instance, the district court granted a motion to continue the (Continued)

## 2. Sufficiency of the Evidence

The jury convicted Watkins of a drug-trafficking conspiracy. *See* 21 U.S.C. § 846. To sustain its burden of proof, the prosecution had to establish: "(1) an agreement between two or more persons to engage in conduct that violates a federal drug law; (2) the defendant's knowledge of the conspiracy; and (3) the defendant's knowing and voluntary participation in the conspiracy." *United States v. Green*, 599 F.3d 360, 367 (4th Cir. 2010). We conclude that a rational jury could find each of those elements beyond a reasonable doubt.

Watkins contends that there is insufficient evidence that he knew about the conspiracy to distribute eutylone because there is no direct evidence "that [he] knew about the contents of the closed packages transported by the two women from Atlanta to Charlotte." Opening Br. at 19. But a jury can infer that a defendant knew about a conspiracy from circumstantial evidence, "such as [the defendant's] relationship with other members of the conspiracy, the length of his association, his attitude, conduct, and the nature of the conspiracy." *United States v. Landersman*, 886 F.3d 393, 406 (4th Cir. 2018) (citation omitted). Indeed, a defendant's knowledge or intent is ordinarily not susceptible to proof by direct evidence. It is generally through reasonable inferences from circumstantial evidence that a jury understands the defendant's mind. *See United States v.*

---

trial on March 18, which would have been *after* the trial already occurred were the transcripts' timeline correct. Moreover, the transcripts misstate the days of the week associated with the trial dates, but the docket does not. For example, the transcripts say that the trial began on Monday, March 6. But March 6 was a Sunday. June 6, by contrast, was a Monday.

11

*Hackley*, 662 F.3d 671, 679 (4th Cir. 2011) ("Circumstantial evidence alone is sufficient to support a conviction for conspiracy.").

Even so, Watkins argues that the jury's inferences about his knowledge were "unreasonable." But this argument, in effect, asks us to reweigh the evidence that the jury properly considered. That is not our role.

First, Watkins argues that the jury should have inferred from his sending $4,500 cash to Cloud during the third trip to Atlanta that he could not have been the source of the drugs. For, according to Watkins, suppliers do not send cash to buyers. To start, the jury was not required to believe the testimony that Watkins sent cash to Cloud. But even if it did so, the ready exchange of cash among conspirators—whatever the reason for it—does little to undermine the existence or knowledge of a conspiracy. Indeed, a longstanding or multifaceted relationship can be probative of the existence of a knowing agreement to distribute drugs. *See United States v. Dennis*, 19 F.4th 656, 669–70 (4th Cir. 2021); *cf.* J.A. 120–21 (describing the relationship between Watkins and Cloud as like one between brothers).[9]

Moreover, Watkins's narrow focus on the transaction in which he allegedly provided cash loses the broader evidentiary context. Take Sanders's October 16–17 trip to pick up pills: Sanders gave Cloud's cash to Watkins; Watkins gave Sanders a box to deliver to Cloud. The jury surely could infer that the box was filled with pills based on the

---

[9] Though we need not hypothesize about why Watkins may have sent money to Cloud, some evidence at trial suggested that the alleged $4,500 cash payment was for a music video. A reasonable jury could have accepted that testimony and found that music was only one part of their relationship.

surrounding circumstances, including Sanders's experience with Cloud, his remark that she would be doing the "same thing" as before,[10] and the calls among the co-conspirators. The jury was not required to view the third trip in isolation even if we were to accept Watkins's preferred explanation of it.

Watkins's second argument—that "[i]t is just as reasonable to infer that the 'I don't have it here' statement . . . related to money, not to the Versace box"—can be quickly disposed of because Watkins conflates Sanders's and Anderson's trips. Watkins said that he wouldn't "have it in there" on October 16–17, when *Sanders* was the courier. And there was no evidence he ever gave any money to Sanders. Anderson's trip, which involved the Versace box, occurred on October 24, and Watkins made no similar statement on that day.

Finally, Watkins claims that the witnesses explained that Anderson got the box not from him, but from the tall, light-skinned man in the red car. And it is true that evidence of this version of events was presented: O'Neill and Childs said they saw Anderson receive

---

[10] Watkins argues that *United States v. Pauling*, 924 F.3d 649 (2d Cir. 2019), shows that no reasonable jury could have concluded that Cloud's "same thing" comment meant Sanders would be picking up drugs. In *Pauling*, a drug buyer told one of two co-conspirators—Conspirator A—that he wanted the "same thing as last time"; then the co-conspirators sold the buyer 14 grams of heroin. *See id.* at 659. While recognizing that a jury could reasonably infer that the buyer had previously bought 14 grams of heroin from Conspirator A, the Second Circuit held that no rational jury could find beyond a reasonable doubt that the buyer's statement meant those possible prior 14 grams were attributable to Conspirator B. *Id.* But here we have no such attenuation. Evidence showed that Cloud sent Sanders to Atlanta to pick up drugs in the summer of 2020. And Sanders testified that Cloud asked her to take another road trip to Atlanta in October for the "same thing." So a rational jury could easily infer that the second trip—wherein Watkins was a confirmed participant—also entailed picking up drugs. In fact, Sanders herself made that exact inference and testified to it. *See* J.A. 128 ("[Prosecution:] Did you hear the point in the call where [Cloud] mentioned, he said 'same thing?' [Sanders:] Yeah. . . . I assumed he wanted me to pick up pills.").

the Versace box from a man of that description.[11]   But a rational jury was entitled to disbelieve that version of events.  Both defense witnesses had apparent bias.  Childs was Watkins's wife.  O'Neill, meanwhile, rented a booth at K3Soundz, styled hair for Watkins's music videos, and sang Watkins's praises on the witness stand.  And, of course, it is not simply bias that entitles a rational jury to disbelieve a witness.  The jury was also permitted to simply weigh Watkins's version of events against the substantial evidence implicating him and conclude that the prosecution's version of events occurred.  Reweighing that evidence is, again, not our job.

Watkins was entitled to make these arguments to the jury, as he did.  But the jury was not required to believe them.  And since there is evidence from which a rational jury could have convicted Watkins, we decline to second guess the jury.[12]

## B.    Lyrics

Toward the end of his defense presentation, Watkins called his wife, Childs, as a witness.  Childs testified that she and Watkins are devout Muslims, that Watkins is a good father, and that Watkins has a strong work ethic.  She described Watkins as "into his

---

[11] Sanders, too, claimed to meet this man—in summer 2020, months before Anderson traveled to Atlanta in late October.

[12] We also reject Watkins's claim that the evidence failed to show that he participated in the conspiracy.  Once a conspiracy is established, as it was here, "only a slight connection need be made linking a defendant to the conspiracy to support a conspiracy conviction, although this connection also must be proved beyond a reasonable doubt." *United States v. Seigler*, 990 F.3d 331, 337 (4th Cir. 2021) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)).  As the evidence already discussed demonstrates, a reasonable jury could conclude that Watkins had at least a "slight" hand in the conspiracy; in fact, it could determine that Watkins was a principal player.

14

religion" and asserted that it is "not in his character to do drugs." J.A. 353. On cross-examination, the prosecution asked Childs whether she had heard a lyric from Watkins and Cloud's song *Don't Do It*: "They've got more money than all them. We got more guns than all of them." J.A. 358. Childs said yes. The prosecution next asked Childs about another lyric, but Watkins objected on relevance grounds before Childs could answer, and the court sustained the objection.

The prosecution then inquired about lyrics from more of Watkins's songs but Watkins again objected. The district court called counsel to the bench, where Watkins explained that he did not see his lyrics' relevance. The prosecution responded that Watkins "elicited character evidence . . . from his wife; that he's a good Muslim and anything like this is out of character." J.A. 359–60. The court replied:

> Normally I would prohibit this kind of cross on lyrics, but I do think the door was open wide on character evidence on Direct with respect to character traits of the defendant. So I think this is responsive to it and covered by Rules 404 and 405. And so any objection I'll deny, but I will say that it'll get cumulative soon.

J.A. 360. The prosecution thus asked Childs about the lyric "I'm a doper, for real," in Watkins's track *You Know It*. J.A. 360–61. Childs knew that line, too.

On redirect, Childs explained that she thought Watkins gave Anderson cash to deliver to Cloud as payment for a music video for their song *Truckloads*. On recross, therefore, the prosecution asked whether "*Truckloads* is a song about dealing drugs." J.A. 364. Childs answered, "I wouldn't say it's just about dealing drugs." *Id.* The prosecution then asked Childs if she was familiar with Watkins's lyric, "I've got truckloads and bales,

15

don't even put it on a scale." *Id.* Watkins objected on relevance grounds but the district court overruled the objection, and Childs confirmed that she had heard the lyric.

### 1.     Standard of Review

Watkins objected to the cross examination using his lyrics as irrelevant. But on appeal, he argues that the evidence was inadmissible as hearsay or improper character evidence. "To preserve an argument on appeal, the defendant must object on the same basis below as he contends is error on appeal." *United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014). So Watkins forfeited his hearsay and character-evidence arguments by not raising them below.

"Forfeited arguments are reviewed for plain error." *United States v. Boyd*, 5 F.4th 550, 554 (4th Cir. 2021); *see* Fed. R. Crim. P. 52(b); Fed. R. Evid. 103(e). Satisfying that standard requires: (1) an error; (2) that is clear or obvious under the law at the time of review; (3) that seriously affects the defendant's substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Olano*, 507 U.S. 725, 732–34 (1993).

### 2.     Hearsay

Watkins suggests that his lyrics were hearsay. Hearsay is a declarant's "statement," not made "while testifying at the current trial," that makes an assertion and is offered in evidence "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Watkins's lyrics were "statements" made by a "declarant" (Watkins) while not "testifying" that "asserted" something: "I'm a doper, for real," and "I've got truckloads and bales, don't even put it on a scale." But the Rules of Evidence specifically provide that a party-

16

opponent's out-of-court statements are "not hearsay." Fed. R. Evid. 801(d)(2)(A); *see United States v. Recio*, 884 F.3d 230, 234 (4th Cir. 2018) (affirming the admission of lyrics under Rule 801(d)(2)(A)). Therefore, the district court did not plainly err in failing to exclude these statements under the hearsay rule.

### 3. Character Evidence

Watkins's other argument on appeal is that the lyrics should have been excluded as propensity evidence. *See* Rule 404(a), (b). Yet "a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." Fed. R. Evid. 404(a)(2)(A). Moreover, "[o]n cross-examination of the [defendant's] character witness, the court may allow an inquiry into relevant specific instances of the [defendant]'s conduct." *Id.* 405(a).

Watkins argues that inquiring about his lyrics should have been prohibited under the character-evidence rules. The prosecution counters, and the district court found, that even if the lyrics were character evidence, Watkins "opened the door" to it by presenting Childs's testimony of his good character. Specifically, Childs testified that Watkins neither sells nor does drugs—indeed, that "[i]t's not in his *character* to do drugs." J.A. 351, 353 (emphasis added). Rather, Watkins is "into his religion and he's into his family and . . . he's into his work ethic." J.A. 353. He is also a "very, very good father" who is "into making sure that he builds generational wealth for his children." J.A. 345, 353.

The district court did not err in finding that Childs's testimony opened the door. Childs not only noted that Watkins was a "good Muslim" but explained that it was "not in [Watkins's] *character* to do drugs," and she proceeded to support that opinion by reference

17

to Watkins's faith, fatherhood, and work ethic.  She painted a picture of Watkins as an upright family man and strongly suggested that, in accordance with that character, he would not have involved himself in the conspiracy to distribute eutylone.  The district court reasonably concluded that those statements are character evidence that opened the door to counterevidence.  *See United States v. Mendoza-Prado*, 314 F.3d 1099, 1105 (9th Cir. 2002) ("Defendant testified that he was a family man who was busy providing for his family and lacked the time, the inclination, and the courage to become involved in dealing cocaine. . . . The foregoing evidence of general good character opened the door for the government's evidence of prior bad acts to demonstrate bad character.").

Accordingly, the prosecution was entitled to "offer evidence to rebut" Watkins's character evidence.  Fed. R. Evid. 404(a)(2)(A).  But it did not even go that far.  The prosecution did not "offer evidence."  Rather, pursuant to Rule 405(a), it only "inquir[ed] into relevant specific instances of [Watkins]'s conduct."  The prosecution merely asked Childs whether she was "familiar" with Watkins's lyrics, accepting Childs's answer each time and never pushing for more detail.[13]

---

[13] This represents yet another reason why the lyrics were not hearsay—Rule 405(a) questioning does not "offer" a statement "to prove the truth of the matter asserted" therein. "The theory is that, since the reputation witness relates what he has heard, the inquiry tends to shed light on the accuracy of his hearing and reporting." Fed. R. Evid. 405 advisory committee's notes; *see Michelson v. United States*, 335 U.S. 469, 479, 483 (1948). It matters not whether the defendant actually did the things about which the prosecution inquires. *See Michelson*, 335 U.S. at 479 ("The prosecution may . . . show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that [the defendant] is, but the name that he has which is put in issue."). The question is whether the witness is intimately familiar with the defendant's character and/or reputation and, if so, is giving a complete picture thereof. *See id.* ("[The defendant's] own witness . . . may (Continued)

So while the prosecution might have exploited Watkins's decision to "open the door" to character evidence even more than it did, the district court did not err by permitting the limited inquiry into Watkins's lyrics.

### C.    Rejection of Proposed Jury Instructions

Before the district court issued jury instructions, Watkins proposed that the court issue a particular instruction with respect to the meaning of "reasonable doubt."[14]  The court denied his proposal in favor of the "time-tested" instruction that "has been reviewed by the Fourth Circuit":  "[T]he term 'reasonable doubt' means just what it says.  It is a doubt based upon reason and common sense.  Its meaning is no doubt self-evident and understood by you, and the Court will not attempt to define the term further."  J.A. 374–75.

Watkins contends that the district court erred in rejecting his proposed jury instructions.  "Both the decision to give (or not to give) a jury instruction and the content of an instruction are reviewed for abuse of discretion."  *United States v. Russell*, 971 F.2d 1098, 1107 (4th Cir. 1992).  In *United States v. Williams*, 152 F.3d 294, 298 (4th Cir. 1998), we explained that "[t]he trial court is not required to define reasonable doubt as a matter of

---

be required to disclose rumors and reports that are current even if they do not affect his own conclusion.").  The prosecution's questions here took that form.

[14] "A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case.  If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty.  If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty."  Defendant's Proposed Request to Charge, *United States v. Watkins*, No. 3:20-cr-0385 (W.D.N.C. June 7, 2022), ECF No. 259.

course so long as the jury is instructed that a defendant's guilt must be proven beyond a reasonable doubt; the Constitution does not obligate a court to further define the standard." *Williams* remains good law and forecloses Watkins's argument. So we reject Watkins's challenge to the district court's refusal to instruct the jury on his preferred explanation of reasonable doubt.

### D.    Calculation of Converted Drug Weight

Following Watkins's conviction, the probation officer submitted a presentence report that concluded that Watkins knew that his relevant conduct involved at least 4.39 kilograms of eutylone, or that it was reasonably foreseeable to Watkins that it did so. In it, she noted that Anderson transported 2.39 kilograms of eutylone on October 24 and, based upon that figure and Sanders's testimony, estimated that Sanders transported two kilograms of eutylone during her October 16–17 trip. Because eutylone is not specifically referenced in the U.S. Sentencing Guidelines, the probation officer calculated the converted drug weight as well. *See* U.S.S.G. § 2D1.1 cmt. nn.6 & 8. She applied a 1-to-380-gram ratio— each gram of eutylone representing 380 grams of converted drug weight—for a total converted drug weight of 1,668.58 kilograms. Based on an offense level of thirty and a criminal history category of two, the Guidelines advised a sentence of 108 to 135 months' imprisonment.

Watkins objected to the drug-quantity calculation, arguing that only the eleven pills tested by the forensic chemist should be considered in determining quantity. He also maintained that there was insufficient evidence to support a finding that Sanders transported two kilograms of eutylone when none of the pills from that delivery were

20

seized.  Lastly, Watkins objected to the drug-conversion ratio applicable to eutylone.  He contended that the probation officer should have used a 1-gram-to-250-milligram ratio because eutylone is analogous to the illicit drug MDMA, and U.S.S.G. § 2D1.1 cmt. n.9 describes the typical weight of an MDMA pill as 250 milligrams.

The district court overruled all of Watkins's objections to the presentence report.  It found that the drug-quantity calculation based on a 1-to-380-gram ratio was "consistent with the evidence in the case [and] the scientific testimony by the chemist." J.A. 481.  The court explained that sampling—testing a representative group of pills for their chemical properties and extrapolating the results to the untested pills—is "a very reasonable way of assessing drug weight, especially with respect to these facts where there's a very large volume of pills, a pattern and practice established over time by the evidence." *Id.*  And as to the two kilograms attributed to Sanders's second trip, the court "th[ought] that the estimate by the Government with respect to the October 17th Sanders trip ma[d]e[] sense based upon the evidence, text messages of stolen pills, remaining pills, and a dire need for the courier trip to occur to restock." J.A. 482.

### 1.    Standard of Review

"We review the district court's calculation of the quantity of drugs attributable to a defendant for sentencing purposes for clear error." *United States v. Randall*, 171 F.3d 195, 210 (4th Cir. 1999).  A calculation isn't clearly erroneous so long as it is "supported by competent evidence in the record." *Id.*  "Neither the Guidelines nor the courts have required precise calculations of drug quantity." *United States v. Uwaeme*, 975 F.2d 1016, 1019 (4th Cir. 1992).

21

### 2.    Drug Quantity

First, Watkins says the district court erred in estimating the drug quantity in the 8,909 seized pills based upon a sample of only eleven pills.  But in doing so, the district court properly relied upon the testing performed by the prosecution's forensic chemistry expert, which concluded that the 8,909 seized pills contained 2.39 kilograms of eutylone. The expert explained that such sampling is an accepted testing method and allowed him to conclude that each of the 8,909 pills, which were visually consistent and found together in a single parcel, contained eutylone.  *See United States v. Serrano-Lopez*, 366 F.3d 628, 639 (8th Cir. 2004).  This procedure met the prosecution's burden to establish drug quantity by a preponderance of the evidence.  *See Uwaeme*, 975 F.2d at 1019–21; *United States v. Dinh*, 920 F.3d 307, 313 (5th Cir. 2019); *United States v. Rodriguez*, 525 F.3d 85, 107–08 (1st Cir. 2008).

Second, Watkins argues that the district court erred in including the roughly two kilograms of eutylone involved in Sanders's October 16–17 transaction in the drug-quantity calculation.  But he cannot identify any error, let alone clear error.  The district court, having heard the evidence during trial, quite reasonably concluded that Watkins delivered to Sanders a box containing an estimated two kilograms of eutylone.  *See* J.A. 482 (discussing "messages deal[ing] with the volume of pills, the depletion of inventory based on theft, and sales that are consistent with the estimate that the Government [wa]s asking the Court to make"); U.S.S.G. § 2D1.1 cmt. n.5 ("Where there is no drug seizure . . . , the court shall approximate the quantity of the controlled substance.  In making this

22

determination, the court may consider . . . similar transactions in controlled substances by the defendant . . . .").

Thus, the district court's drug-quantity calculation was not clearly erroneous.

### 3.    Converted Drug Weight

Next, Watkins asserts that the district court erred in applying a 1-to-380-gram drug-conversion ratio to the 4.39 kilograms of eutylone attributed to him. Instead, Watkins argues, the district court should have analogized eutylone pills to MDMA and converted at a 1-gram-to-250 milligram ratio.

The district court did not err. The Guidelines state that, where the drug-conversion table does not list the substance involved in the offense, the court should look to the most analogous listed substance. U.S.S.G. § 2D1.1 cmt. n.6. The drug-conversion table explicitly lists "synthetic cathinones" and provides the 1-to-380-gram ratio. *See id.* cmt. n.8(D). The probation officer, Drug Enforcement Administration, and Watkins himself concur that eutylone is a synthetic cathinone. So the district court committed no error in using the drug-conversion ratio specifically assigned for the category of substances into which eutylone falls.

### E.    Denial of Motion for Downward Departure

Finally, Watkins asked the district court to depart downward under U.S.S.G. § 2D1.1 cmt. n.27(D). He argued that eutylone is similar to methylone, which note 27(D)

23

expressly mentions as potentially warranting a downward departure.[15]  But the court did "not believe that the facts in this case warrant[ed] a departure under 27D for the reasons that [it] previously stated."  J.A. 482.  Those reasons included the chemist's testimony about eutylone's strength relative to other synthetic cathinones and the evidence linking Watkins to 4.39 kilograms of it.[16]

"If a district court is cognizant of its authority to depart, but does not do so, such a refusal to depart downward from the guideline range is simply not appealable."  *Burgos*, 94 F.3d at 876; *see also United States v. Torres-Reyes*, 952 F.3d 147, 151 n.2 (4th Cir. 2020) (distinguishing between the appeal of a variance and that of a departure).  The district court's explanation indicates that it understood its authority to depart downward under the Guidelines but "d[id] not believe that the facts in this case warrant[ed] a departure under 27D."  J.A. 482.  Its discretionary denial of Watkins's request for a downward departure is not reviewable.

---

[15] Note 27(D) explains that an upward or downward departure may sometimes be appropriate for synthetic cathinones because "there may be cases in which a substantially lesser or greater quantity of a synthetic cathinone is needed to produce an effect on the central nervous system similar to the effect produced by a typical synthetic cathinone."  So, if the synthetic cathinone involved in a case is one that a person must consume a far greater quantity of to have the same physical effects as a typical synthetic cathinone—*e.g.*, methylone—"a downward departure may be warranted."  *Id*.

[16] The district court also denied Watkins a downward departure based on his criminal record and recidivism.  *See* J.A. 491 ("[Watkins was] convicted at age 19 for armed robbery, two counts, aggravated assault, spen[t] a substantial amount of time in prison, [was] released in 2016 and then engag[ed] in criminal conduct that b[rought] Mr. Watkins in front of th[e] court in 2020, just four years later.").

24

\*       \*       \*

The district court's decision is thus

*AFFIRMED.*