**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-4037

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

NELSON EVANS,

Defendant – Appellant.

No. 24-4051

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

KALUB SHIPMAN, a/k/a Kato, a/k/a Baydo,

Defendant – Appellant.

No. 24-4073

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JAQUATE SIMPSON, a/k/a Quay, a/k/a J, a/k/a Stacks, a/k/a Predator,

Defendant – Appellant.

_____

**No. 24-4103**

_____

UNITED STATES OF AMERICA,

  Plaintiff – Appellee,

v.

LANDIS JACKSON, a/k/a Juve, a/k/a Juvie,

  Defendant – Appellant.

_____

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk. John A. Gibney, Jr., Senior District Judge. (2:20-cr-00090-JAG-LRL-4; 2:20-cr-00090-JAG-LRL-3; 2:20-cr-00090-JAG-LRL-1; 2:20-cr-00090-JAG-LRL-2)

_____

Argued: October 23, 2025                    Decided: January 21, 2026

_____

Before NIEMEYER, RUSHING, and HEYTENS, Circuit Judges.

_____

Affirmed by published opinion. Judge Heytens wrote the opinion, which Judge Niemeyer and Judge Rushing joined.

_____

**ARGUED:** Gerald Thomas Zerkin, Richmond, Virginia; Heather Lynn Carlton, CARLTON LAW PLC, Charlottesville, Virginia; William Jeffrey Dinkin, WILLIAM J. DINKIN, PLC, Richmond, Virginia; Elizabeth Anne Franklin-Best, ELIZABETH FRANKLIN-BEST, P.C., Columbia, South Carolina, for Appellants. Daniel J. Honold, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Erik S. Siebert, United States Attorney, Kristin G. Bird, Assistant United States Attorney, Joseph E. DePadilla, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

2

TOBY HEYTENS, Circuit Judge:

Defendants Jaquate Simpson and Landis Jackson ran a lucrative drug ring. When a customer (Brandon Williams) failed to pay for a shipment of drugs, Simpson and Jackson set out to punish him and offered Defendant Kalub Shipman $10,000 to kill someone close to Williams. Shipman recruited his cousin (Defendant Nelson Evans) to help him. Shipman and Evans traveled from North Carolina to Virginia and murdered Williams' aunt, Lillian Bond.

Defendants were charged with a litany of offenses and a jury found them guilty on all counts. The district court sentenced each defendant to life imprisonment. We affirm.

## I.

Jackson, Shipman, and Evans raise sufficiency challenges. We start there "because any defendant who prevails" on such a challenge "is entitled to a judgment of acquittal without further proceeding." *United States v. Huskey*, 90 F.4th 651, 662 (4th Cir. 2024). In judging sufficiency, we consider all evidence the jury had before it, "both admissible and inadmissible," viewed "in the light most favorable to the prosecution." *Id.* (quotation marks removed). We assume the jury "resolved all credibility disputes or judgment calls in the government's favor" and "must uphold the jury's verdict if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotation marks removed). Applying those standards, we conclude none of the sufficiency challenges succeed.

## A.

Jackson challenges his convictions for participating in a continuing criminal

3

enterprise (Count 1) and murder while engaged in such an enterprise (Count 2), arguing there was insufficient evidence that he "occupie[d] a position of organizer, a supervisory position, or any other position of management" with respect to "five or more other persons." 21 U.S.C. § 848(c)(2)(A). We disagree. The jury heard evidence that Simpson (who raises no sufficiency challenge) ran an organization of more than five people. The jury also heard that Jackson was Simpson's "right-hand man," JA 3425, 4583; that he personally oversaw more than five sub-dealers; and that he eventually took over for Simpson as the organization's leader. That evidence is sufficient to support the jury's verdict. See *United States v. Ricks*, 882 F.2d 885, 891 (4th Cir. 1989) ("[T]he statute does not require that the additional five individuals be under the direct and immediate control or supervision of defendant.").

## B.

Jackson also asserts the jury heard insufficient evidence to convict him for selling cocaine to Williams (the delinquent customer whose aunt was later murdered) in April 2016 (Count 5), contending that particular transaction was all Simpson's doing. But the jury found Jackson guilty of engaging in a continuing criminal enterprise with Simpson to distribute cocaine, which necessarily means the two were coconspirators. See *Rutledge v. United States*, 517 U.S. 292, 300 (1996). If the April 2016 sale to Williams was a "reasonably foreseeable" act "in furtherance of" Jackson and Simpson's drug conspiracy, then Jackson is liable for the sale as a conspirator. *United States v. Ashley*, 606 F.3d 135, 142–43 (4th Cir. 2010); see *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946). And, as Jackson concedes, witnesses testified that Simpson's organization had previously sold

4

cocaine to Williams' organization and that Jackson played a role in those transactions. That is enough evidence to permit the jury to infer coconspirator liability for the April 2016 sale.

## C.

Shipman (the person Simpson and Jackson recruited to murder one of Williams' relatives) argues there was insufficient evidence he was engaged in a conspiracy to distribute cocaine when he murdered Lillian Bond (Count 4) because he neither knowingly joined the drug conspiracy nor personally trafficked drugs. But a defendant "may be convicted of conspiracy with little or no knowledge of the entire breadth of the criminal enterprise," so long as he "joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion." *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996) (en banc) (quotation marks removed). Even "apart from selling narcotics," "a variety of conduct . . . can constitute participation in" a conspiracy to distribute narcotics, from "supplying firearms" to "purchasing plane tickets for coconspirators." *Id.* at 859.

Those established standards foreclose Shipman's sufficiency challenge. Shipman told a government witness that the hit was ordered to punish Williams for taking drugs without paying. Based on that evidence, along with evidence about Shipman's relationship with Jackson and the nature of the hit itself, the jury could infer that Shipman knew about "an agreement to [distribute substantial amounts of cocaine] . . . between two or more persons" and that the hit's purpose was to support the drug conspiracy. *Burgos*, 94 F.3d at 857. No more was necessary.

5

D.

Jackson, Shipman, and Evans cite a variety of reasons why the evidence was insufficient to convict them for murder-for-hire (Count 8) and conspiracy to commit murder-for-hire (Count 7). The murder-for-hire statute makes it unlawful to "travel[] in or cause[] another . . . to travel in interstate or foreign commerce, or use[] or cause[] another . . . to use the mail or any facility of interstate or foreign commerce" with the intent "that a murder be committed . . . as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value." 18 U.S.C. § 1958(a). We are not persuaded by any of the various sufficiency challenges.

1.

Jackson argues there was "no evidence" he "had any role" in Bond's murder. Defs. Br. 60. Not so. The jury heard evidence that Simpson and Jackson discussed how to handle Williams' failure to pay and that Jackson offered up "two dudes" to kill someone close to Williams. JA 4588–89.

2.

Shipman asserts there was no evidence he received any payment for Bond's murder. But Shipman forfeited any sufficiency challenge to the relevant counts (Counts 7 and 8) by failing to renew his mid-trial motion for a judgment of acquittal on those counts after putting on a defense case. See JA 5623 (renewing motion for a judgment of acquittal on sufficiency grounds only "with respect to Counts Four and Nine"). For that reason, appellate review is "foreclosed" unless Shipman "can show a manifest miscarriage of justice." *United States v. Watkins*, 111 F.4th 300, 307 (4th Cir. 2024) (quotation marks

6

removed). Shipman makes no argument that his murder-for-hire and conspiracy to commit murder-for-hire convictions meet that high bar—and, in any event, the jury heard testimony that Shipman was promised $10,000 for the hit.

3.

Evans argues there was insufficient evidence that he: (i) shot Bond; (ii) intended to murder Bond when he traveled in interstate commerce (*i.e.*, when he drove with Shipman from North Carolina to Virginia); (iii) intended to murder Bond in exchange for something of pecuniary value; or (iv) conspired with others to murder Bond. Once again, we see no basis for disturbing the jury's verdict.

We start with the dispute about who exactly shot Bond. It is—at minimum—unclear whether this question matters for sufficiency purposes because the murder-for-hire statute does not even require that a murder take place. See 18 U.S.C. § 1958(a) (requiring only that a defendant take certain actions "with intent that a murder be committed"). But we do not pursue the matter further, both because the government does not raise that issue and because we agree with the government that a reasonable jury could have found that Evans shot Bond. True, the sole eyewitness to the shooting offered a description that did not match Evans. But the jury could have disregarded the eyewitness's testimony and still had sufficient evidence to conclude that Evans shot Bond given that: (i) Shipman told a government witness that Evans would be the shooter; (ii) Evans and Shipman went to Bond's house to "do[] recon" the night before the murder, JA 4108–09; and (iii) cell-site location data put Evans in the area at the time of the murder.

A reasonable jury also could have inferred that Evans already planned to kill Bond

7

when he and Shipman traveled in interstate commerce. Soon after Shipman and Evans arrived in Virginia, Shipman told a witness—in Evans' presence—that they were there "to do the hit," and Evans expressed neither surprise nor disagreement. JA 4106–08. Based on this evidence, a rational factfinder could infer that Evans knew about the plan before he arrived in Virginia.

The evidence was likewise sufficient to find that Evans intended to kill Bond in exchange for money. Shipman told a witness he had been promised $10,000 for the hit and offered that witness a cut of the payment to be the shooter. When the witness declined, Shipman recruited Evans instead, and after the murder, Evans' girlfriend found him counting "at least [$]2,000" in cash. JA 3379–80. Based on this evidence, the jury could infer that Shipman offered Evans a cut of the $10,000 to kill Bond and that Evans killed her for that reason.

Finally, the evidence we have just recounted shows why there was sufficient evidence that Evans conspired with Shipman to murder Bond. Shipman told a witness that he would "get his cousin [Evans] to do the shooting." JA 4108. Evans and Shipman traveled together from North Carolina to Virginia, they both went to Bond's home the night before the murder to "do[] recon," and they traveled back to North Carolina together after the murder. JA 4108–09.

## II.

All four defendants argue that convicting and sentencing them for both murder-for-hire (Count 8) and conspiracy to commit murder-for-hire (Count 7) violated the Double Jeopardy Clause. Evans, Jackson, and Shipman preserved this challenge by

8

timely raising it before the district court, while Simpson failed to do so. Preserved or not, we conclude the outcome is the same for all four defendants: Their convictions for both murder-for-hire and conspiracy to commit murder-for-hire do not violate the Double Jeopardy Clause.

The Fifth Amendment declares that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Among other restrictions (such as prohibiting retrials after an acquittal), the Double Jeopardy Clause forbids punishing a defendant for violating two statutes that "are in law and in fact the same offense." *United States v. Schnittker*, 807 F.3d 77, 81 (4th Cir. 2015) (quotation marks removed). To determine whether that standard is satisfied, we ask whether "each" charge "requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Applying that standard here, we conclude that murder-for-hire and conspiracy to commit murder-for-hire are different constitutional offenses because each requires proof of a fact the other does not.

Start with murder-for-hire. To commit that offense, a defendant must *do* something that affects interstate commerce by "travel[ing] in or caus[ing] another . . . to travel in interstate or foreign commerce, or us[ing] or caus[ing] another . . . to use the mail or any facility of interstate or foreign commerce." 18 U.S.C. § 1958(a). In contrast, there is no such requirement for conspiracy to commit murder-for-hire. "It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself." *Salinas v. United States*, 522 U.S. 52, 65 (1997). Murder-for-hire thus requires proof of at least one

9

fact that conspiracy to commit murder-for-hire does not.

The same is true of conspiracy to commit murder-for-hire. Under normal circumstances, there is no double jeopardy problem with convicting a defendant of both conspiracy and the underlying substantive offense because the conspiracy requires proof of an unlawful agreement while the substantive offense does not. See, *e.g.*, *Pereira v. United States*, 347 U.S. 1, 11 (1954). Defendants argue that principle breaks down here because murder-for-hire requires that the accused take the required act "with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value." 18 U.S.C. § 1958(a). In defendants' view, "consideration" requires "concerted action," which means that murder-for-hire—just like conspiracy to commit murder-for-hire—requires proof that a defendant made an agreement with at least one other person. Defs. Br. 97. In other words, defendants argue that the essence of a conspiracy offense (an unlawful agreement) is already baked into the substantive murder-for-hire statute.

We see no double jeopardy problem because we disagree with defendants' reading of the murder-for-hire statute. Instead, we join "the overwhelming majority of circuits" in holding that the substantive murder-for-hire offense "does not require the existence of an actual murder-for-hire agreement." *United States v. Dvorkin*, 799 F.3d 867, 875 (7th Cir. 2015) (collecting cases). Like those courts, we conclude "the statutory phrase 'consideration for a promise or agreement to pay' does not create a separate 'agreement element,' but rather modifies the type of intent which a defendant must possess" when

10

traveling in or otherwise affecting interstate commerce. *Id.* at 875–76. In contrast, conspiracy to commit murder-for-hire requires an agreement between at least two people: "an agreement that the underlying offense be committed." *United States v. Runyon*, 994 F.3d 192, 202 (4th Cir. 2021). For that reason, the two offenses are not the same for double jeopardy purposes.

## III.

We turn next to the district court's denials of defendants' motions to suppress various evidence. We review legal conclusions de novo and factual findings for clear error and may "affirm on any ground supported by the record." *United States v. Brown*, 701 F.3d 120, 125 (4th Cir. 2012) (quotation marks removed); see *United States v. Ordonez-Zometa*, 141 F.4th 531, 548 (4th Cir. 2025). Here too, we see no reversible error.

## A.

Simpson argues the district court should have suppressed location data from a GPS tracker placed on a rental car he drove because the warrant authorizing it was based on stale information from an unreliable informant. Simpson further contends that, because officers relied on data captured by the GPS tracker to authorize a pole camera and pen register, the district court also should have suppressed information obtained from those devices.

We conclude the GPS-tracker warrant was valid and thus reach no other issues. The warrant application supported the informant's credibility by describing the person's long history of providing accurate information to law enforcement. See *United States v. Gondres-Medrano*, 3 F.4th 708, 716 (4th Cir. 2021); *United States v. Bynum*, 293 F.3d 192,

11

197 (4th Cir. 2002). Simpson argues the informant's intel about his extensive drug dealing and use of multiple cars (including rental cars) to facilitate that drug dealing was stale by the time the warrant issued. But the district court found that the fact that Simpson had "continue[d] to rent multiple cars" during the intervening period suggested he was still dealing drugs when officers obtained the warrant. JA 2744; see *United States v. McCall*, 740 F.2d 1331, 1335–36 (4th Cir. 1984). Finally, we reject Simpson's argument that the GPS-tracker warrant was an impermissible general warrant because the warrant was limited to a single vehicle that law enforcement had probable cause to believe Simpson was using to traffic cocaine.

## B.

Simpson next mounts a specific challenge to the pen register evidence, asserting that the court order authorizing it did not describe its "geographic limits" as required by federal and state statutes. 18 U.S.C. § 3123(b)(1)(C); N.C.G.S. § 15A-263(b)(1)(c). But the installation and use of a pen register is not a Fourth Amendment "search," so suppression under the Fourth Amendment's exclusionary rule is not an available remedy. See *Smith v. Maryland*, 442 U.S. 735, 745–46 (1979). To be sure, there are statutes that also authorize suppressing evidence. See Part III(E), *infra* (providing examples). But the statutes at issue here do not, and this Court has held that the "availability" of statutory suppression "depends on the statutory text." *United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011). We thus join at least five of our sister circuits in holding that statutory suppression is not an available remedy for a pen register statute violation when, as here, the statutes do not provide for suppression. See *United States v. Wallace*, 885 F.3d 806, 809–10 (5th Cir. 2018); *United*

12

*States v. Powell*, 847 F.3d 760, 771 (6th Cir. 2017); *United States v. Fregoso*, 60 F.3d 1314, 1320–21 (8th Cir. 1995); *United States v. Forrester*, 512 F.3d 500, 512–13 (9th Cir. 2008); *United States v. Thompson*, 936 F.2d 1249, 1249–50 (11th Cir. 1991).

C.

Simpson makes a one-paragraph argument that a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), revealed that officers made materially false statements in a warrant affidavit and that the district court abused its discretion in concluding otherwise. Defs. Br. 101. But that portion of Simpson's opening brief does not even identify the allegedly false statements, much less explain how and why the district court committed reversible error under the applicable standards of review. As a result, this argument is not properly before us. See, *e.g.*, *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

D.

Shipman argues the district court should have suppressed cell-site location information that officers obtained without a warrant. But the search was conducted before the Supreme Court's decision in *Carpenter v. United States*, 585 U.S. 296 (2018), so "the good-faith exception to the exclusionary rule applies" here. *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018).

E.

A North Carolina state court issued multiple orders authorizing wiretaps on Simpson's phones and listing Jackson as one of several "target subjects." JA 1887–88, 1965–66, 2063–64, 2164–65, 2235–36. Both Simpson and Jackson seek to suppress the resulting evidence, offering different theories. Here too, we are unpersuaded.

13

1.

Simpson argues the initial wiretap applications failed to show that "normal investigative procedures ha[d] been tried and ha[d] failed or reasonably appear[ed] to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c); N.C.G.S. § 15A-293(a)(3). We review the district court's contrary conclusion for abuse of discretion, see *United States v. Wilson*, 484 F.3d 267, 280 (4th Cir. 2007), and we see none here.

The government's burden under the relevant statutes "is not great" and may be satisfied by "present[ing] specific factual information" showing that officers have "encountered difficulties in penetrating the criminal enterprise or in gathering evidence." *Wilson*, 484 F.3d at 281 (quotation marks removed). The district court reasonably concluded the officers met their burden here by offering detailed, non-conclusory explanations for why wiretaps were necessary and why other investigative techniques (including physical surveillance, witness interviews, grand jury proceedings, search warrants, and controlled buys) were insufficient. See *United States v. Galloway*, 749 F.3d 238, 243 (4th Cir. 2014).[1]

2.

Although the orders were only to tap Simpson's phones, Jackson contends the government had to establish probable cause as to him—not just Simpson—because Jackson

---

[1] In his reply brief, Simpson argues for the first time that officers also lacked probable cause for the wiretap because they relied on "stale or unsubstantiated" information. Defs. Reply Br. 12. But Simpson did not make that argument in his opening brief, so it is not properly before us. See *Grayson O Co.*, 856 F.3d at 316.

14

was a named "target." We disagree.

Like the parties, we agree the district court's reason for denying Jackson's motion to suppress was incorrect. In an oral ruling, the court stated that Jackson lacked "standing" to challenge the orders authorizing wiretaps on Simpson's phones, analogizing this situation to one where officers searched Simpson's house and found evidence incriminating Jackson. JA 2761; see *Byrd v. United States*, 584 U.S. 395, 410 (2018) (describing Fourth Amendment "standing" as "a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search"). But here we are dealing with statutes, not the Fourth Amendment. And the relevant federal and state laws specifically authorize "[a]ny aggrieved person"—including "a person who was a party to any intercepted . . . communication"—to "move to suppress the contents of any wire or oral communication intercepted pursuant to [the statute]." 18 U.S.C. §§ 2518(10)(a) & 2510(11); accord N.C.G.S. § 15A-294(g)(1) & 286(1); see *United States v. Apple*, 915 F.2d 899, 904–05 (4th Cir. 1990). Jackson was thus entitled to *seek* suppression here, and the government does not argue otherwise.

We nonetheless affirm the district court's denial of Jackson's motion on alternative grounds. The federal and state statutes at issue require probable cause to believe that "*an individual* is committing, has committed, or is about to commit" a criminal offense and that "particular communications concerning that offense will be obtained through such interception." 18 U.S.C. § 2518(3)(a), (b) (emphasis added); accord N.C.G.S. § 15A-293(a)(1), (2) (emphasis added). Jackson does not dispute that officers had probable

15

cause to believe *Simpson* was conspiring to traffic narcotics and using these phone lines to do so. Under the plain language of the statute, nothing more was required.

We disagree with Jackson's assertion that *United States v. Donovan*, 429 U.S. 413 (1977), requires a different result. *Donovan* involved different provisions of the federal wiretapping statute (18 U.S.C. § 2518(1)(b)(iv) and 2518(8)(d)) and addressed a different question than the one we confront here: Which people *must* be named in a wiretap application and later told that their communications have been intercepted? See *Donovan*, 429 U.S. at 422–23. But neither *Donovan* nor the statutory provisions it interprets "prohibit the investigative agency from naming other individuals" too, including those for whom "probable cause . . . ultimately may not be found." *United States v. Martin*, 599 F.2d 880, 884–85 (9th Cir. 1979), overruled on other grounds by *United States v. De Bright*, 730 F.2d 1255 (9th Cir. 1984) (en banc). We thus join at least three of our sister circuits in holding that, under the federal wiretapping statute, "the government need not establish probable cause as to all participants in a conversation." *United States v. Tortorello*, 480 F.2d 764, 775 (2d Cir. 1973); accord *Martin*, 599 F.2d at 884–85; *United States v. Domme*, 753 F.2d 950, 954 n.2 (11th Cir. 1985). Instead, so long as "probable cause has been shown as to one such participant, the statements of the other participants may be intercepted if pertinent to the investigation." *Tortorello*, 480 F.3d at 755.

## IV.

We conclude by rejecting various other arguments raised by three of the defendants.

## A.

We begin with Simpson. He alone presses a different double jeopardy argument—

16

that his convictions for both participating in a continuing criminal enterprise (Count 1) and distributing cocaine (Count 5) violate the Fifth Amendment. As Simpson concedes, however, the Supreme Court rejected that argument in *Garrett v. United States*, 471 U.S. 773, 786 (1985).

Simpson also argues the district court should have excluded evidence about another murder-for-hire plot as improper character evidence. We review this "evidentiary ruling" for "abuse of discretion," and we see none. *United States v. Brizuela*, 962 F.3d 784, 791 (4th Cir. 2020). The general prohibition on character evidence does not cover "acts that are a part of, or intrinsic to, the alleged crime." *Id.* at 793 (quotation marks removed). That standard is satisfied here. The evidence in question—wiretapped calls in which Simpson discussed yet another murder-for-hire plot to avenge a different drug debt—is "intrinsic" to the alleged crime because it was included in the indictment as part of the continuing criminal enterprise charged in Count 1 and the drug conspiracy charged in Count 3.

B.

We turn next to Jackson, who asserts the district court erred by declining to give two jury instructions he requested. Here too, we review for abuse of discretion, see *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010), and conclude the district court committed no reversible error.

Jackson's first proposed instruction would have told the jury that the government must prove he "was a member of the conspiracy charged in the indictment," not just "some other conspiracy not charged in the indictment." JA 5232. Under this Court's precedent, a district court's refusal to give such an instruction is reversible error only if "the evidence

17

of multiple conspiracies was *so* strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction." *United States v. Cannady*, 924 F.3d 94, 101 (4th Cir. 2019) (alterations and quotation marks removed). That high bar is not met here. The government presented evidence that Jackson played a central role in the single drug trafficking organization identified in the indictment, including strategizing with Simpson about how to fend off competitors and hiring hitmen to avenge unpaid drug debts.

Jackson's second proposed instruction would have cautioned jurors that "mere evidence of a simple buy-sell transaction is sufficient to prove a distribution violation, but not conspiracy." JA 5234. Once again, this Court's precedent is against him. A district court does not err by declining to give a buy-sell instruction where "the facts show[] that the relationship went beyond that of a mere buy-sell transaction." *United States v. Mills*, 995 F.2d 480, 485 (4th Cir. 1993). And here there was ample evidence that Jackson was far more than just a customer: Mere buyers, after all, do not generally help their sellers fend off competitors, much less hire hitmen.

C.

We end with Shipman. He asserts the district court should have: (i) excluded on Confrontation Clause grounds statements that Evans (his fellow traveler to Virginia) made to law enforcement officers; (ii) severed his and Evans' trials because their defenses were mutually antagonistic; and (iii) dismissed one of his convictions (Count 9) as duplicitous. We conclude none of those arguments has merit.

18

1.

The Sixth Amendment states that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. One way that right can be denied is if a "nontestifying codefendant's confession naming [the defendant] as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 201–02 (1987); accord *Bruton v. United States*, 391 U.S. 123, 126 (1968). But the bar for triggering that rule is a high one. Under this Court's precedent, a codefendant's statement only triggers *Bruton*'s "narrow" rule if it "*facially*" incriminates the defendant. *United States v. Benson*, 957 F.3d 218, 228 (4th Cir. 2020) (emphasis added). In contrast, if the codefendant's statement incriminates the defendant "only by virtue of linkage to other evidence at trial—that is, if it incriminates inferentially rather than facially—then it does not implicate *Bruton*." *Id.* (alterations and quotation marks removed).

This Court has not said—and the parties have not briefed—what standard of review applies to a district court's determination that a given statement was or was not "facially" incriminating. But even assuming the standard most generous to Shipman applies (de novo), we conclude the district court made no reversible error.

Shipman argues the district court should have excluded the following statements Evans made to FBI agents shortly after his arrest:

- Evans and Shipman went to Virginia "for vacation," JA 5828;

- while in Virginia, they "weren't together the whole time" because Shipman "had

19

other business," JA 5831;

- they stayed overnight at Shipman's friend's house;

- the next morning, Shipman woke Evans up early to return to North Carolina; and

- on the way back, they stopped at a gas station, where Shipman was captured on security footage.

None of those statements were facially incriminating under this Court's precedent because they were not "sufficient by [themselves] to establish [Shipman's] participation in" Bond's murder, but rather "would have required linkage to additional evidence." *Benson*, 957 F.3d at 232.

Further, the district court gave an appropriate limiting instruction, and we see no "specific reason to doubt that the jury adhered to the district court's limiting instruction." *Id.* at 230. Shipman claims the government asked the jury to use Evans' statements as evidence against him during both its initial closing argument and its rebuttal. We disagree. Before discussing Evans' statements during its closing argument, the government cautioned the jurors—consistent with the district court's limiting instruction—that the statements could only be considered as evidence against Evans. And, having reviewed the relevant transcripts, we conclude the statements in the government's rebuttal with which Shipman takes issue were clearly about Evans, not Shipman.

2.

We next reject Shipman's assertion that the district court committed reversible error by not severing his trial from Evans' after Evans argued in closing that Shipman and a government witness committed the murder and then framed Evans. Had Shipman sought

20

severance on that ground before the district court, we would have reviewed the district court's rejection of his request for abuse of discretion. See *United States v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2002). Because Shipman did not do so, however, that argument is forfeited and our review is solely for plain error under Federal Rule of Criminal Procedure 52(b).[2] We conclude that even if Shipman can satisfy plain-error review's first two requirements—that the district court made an "error" that was "plain"—he cannot carry his "burden" of showing "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer v. United States*, 593 U.S. 503, 507–508 (2021) (quotation marks removed).

A jury that accepted Evans' last-minute argument that Shipman and a government witness murdered Bond and then set up Evans to take the fall would presumably have acquitted Evans. But the jury did not do so. What is more, the jury heard overwhelming evidence connecting Shipman to Bond's murder. Shipman told a witness he was in Virginia to carry out a hit. In addition, testimony, cell phone records, and other evidence put Shipman at Bond's house *three times* before the murder, and again at the time of the murder. For that reason, Shipman cannot show there is a reasonable probability that he would have been acquitted had his trial been severed from Evans'.[3]

---

[2] Before trial, Shipman moved to sever his trial from Evans' because he anticipated that Evans would try to introduce prejudicial evidence of his (Shipman's) gang affiliation. At no point did Shipman raise before the district court the argument he now makes on appeal: that Evans would or did argue that Shipman framed him.

[3] In a single paragraph that lacks any citations beyond those to the trial transcript, Shipman makes a series of scattershot arguments about questions asked by Evans' counsel. See Defs. Br. 52–53. We have reviewed each argument and conclude they all lack merit.

3.

We close with Shipman's duplicity argument. A charge is duplicitous if it "charges two offenses in one count," creating "the risk that a jury divided on two different offenses could nonetheless convict for the improperly fused double count." *United States v. Burfoot*, 899 F.3d 326, 337 (4th Cir. 2018) (quotation marks removed). The charge at issue here is Count 9, which accused Shipman of unlawfully possessing a firearm that had been shipped or traveled in interstate commerce. During trial, Shipman stipulated that the weapon used to murder Bond was a .357 caliber firearm that had traveled in interstate commerce. But during closing arguments, the government suggested it had charged Shipman with unlawfully possessing the .357 *and* another firearm—"the .38 from Newport News." JA 5304. Shipman contends this argument converted Count 9 into a duplicitous charge because it suggested that jurors could find him guilty based on either firearm.

Once again, we conclude Shipman forfeited this argument before the district court. Shipman did not object to the government's statement during closings. True, he later moved for judgment of acquittal on Count 9. But that motion was not based on duplicity; rather, Shipman insisted there was insufficient evidence to convict him of possessing the .38. When the government conceded that was so, Shipman dropped the issue and told the district court he was challenging only his conviction for possessing the .357. The district court therefore rejected Shipman's motion for acquittal "on the same basis" it had earlier overruled Shipman's objections about the .357. JA 5683. Shipman thus never gave the district court an opportunity to consider and rule on his current argument: that the government's reference to the .38 in its closing rendered Count 9 duplicitous.

22

Because Shipman failed to preserve that argument, we once again review only for plain error. See *Watkins*, 111 F.4th at 311. And, here too, even assuming that Shipman could meet that standard's first two requirements, he cannot carry his burden of showing prejudice. The jury found him guilty of using a firearm resulting in death, see 18 U.S.C. § 924(j), and the only firearm used in that offense was the .357. That verdict means that the jury necessarily—and unanimously—credited the government's evidence that Shipman possessed or constructively possessed the .357. See *United States v. Robinson*, 627 F.3d 941, 957–58 (4th Cir. 2010). For that reason, Shipman cannot establish that he was prejudiced by any confusion created by the government's reference to the .38.

* * *

The judgments are

*AFFIRMED*.

23